JoNes, Ohief Judge,
delivered the opinion of the court:
Plaintiff Grace Line Inc. is a Delaware corporation, operating passenger, cargo and mail vessels of American registry on trade routes between Atlantic coast ports of the United States and Pacific coast ports in South America, including those of Peru. Plaintiff’s vessels are utilized by the United States Post Office Department for the maritime conveyance of mail destined for areas in South America encompassed within plaintiff’s trade routes, and have been so utilized since prior to July 1, 1937.
In its petition herein, plaintiff asserts a claim, in counts I and II, for monies allegedly due and owing to it by the *485 United States for the outbound maritime carriage of Peruvian mail between July 1,1937, and February 29,1956, and, in count III, to recover payment for the maritime carriage of mail which is alleged to have been unlawfully diverted by the United States from plaintiff’s vessels to vessels of foreign registry between February of 1953 and February of 1956. The defendant paid the entire amount claimed under count I, and later recouped this amount, alleging it had been previously paid to plaintiff by mistake.
COUNT I
In accordance with the authority conferred upon him by Title 5, § 372, of the United States Code, the Postmaster General of the United States in 1921 negotiated and concluded with the governments of numerous Central and South American countries, including that of Peru, certain postal conventions known as the Pan American Postal Union. Commencing with the Second Congress of the Pan American Postal Union (which then became known as the Postal Union of the Americas and Spain) held in Mexico in 1926, the United States was a party to postal conventions which adopted the principle of “free and gratuitous transit” of mail between the nations signatory to the conventions. The United States took definitive action to effectuate this principle at least as early as July 1, 1937, and continued to do so until March 1, 1956.
Based upon the concept that the countries comprising the Union constitute a single postal territory and that the postal facilities of any one of them should be at the disposal of all, the “free and gratuitous transit” principle imposed an obligation upon each member nation to transport across its territory and to convey, by the same vessels of its flag which it utilized for the maritime carriage of its own mail, all outbound mail of the other members free of any charge whatsoever for this service. A vessel of the flag of any signatory nation performing this service of transporting mail by sea on behalf of any other signatory nation was therefore required to look to the country of its flag for compensation in consideration of the rendition of this service. The Madrid *486 Convention, 1931, of the Postal Union of the Americas and Spain, 47 Stat. 1924,1925, which, was in effect on July 1,1937, provided:
Article 3
Free and Gratuitous Transit
1. The gratuity of territorial, fluvial and maritime transit is absolute in the territory of the Postal Union of the Americas and Spain; consequently, the countries which form it obligate themselves to transport across their territories and to convey by the ships of their registry or flag which they utilize for the transportation of their own correspondence, without any charge whatsoever to the contracting countries, all that which the latter may send to any destination.;
2. In cases of reforwarding, the contracting countries are bound to reforward the correspondence by the ways and means which they utilize for their own dispatches.
On July 1,1937, orders were promulgated and rates established by the Postmaster General for the carriage of “Convention mail,” that is, mail the United States was obligated to transport by vessels of its flag free of charge under the “free and gratuitous transit” provisions of the Postal Union of the Americas and Spain. From that date, until World War II interrupted its service, and from the resumption of its service in 1946, plaintiff carried all of the mail tendered to it by the United States Post Office Department on the southbound portion of the voyages of its vessels. On the return, or northbound, portion of these voyages, plaintiff’s vessels carried the mail tendered to it by the postal administrations of other signatory nations, including that of Peru, at their respective ports.
Payments were made to plaintiff by the Post Office Department in accordance with the latter’s orders and rates dealing with the carriage of “Convention mail.” From July 1, 1937, to September 3, 1954, plaintiff was paid a total amount of $460,763.69 by the Post Office Department for the carriage of Peruvian “Convention mail,” and at no time during this period did the Post Office Department indicate to plaintiff that no compensation would be paid for this particular service. In faot, the Post Office Department sent *487 an inquiry to the Peruvian Post Office Department in 1937 to determine whether or not any vessels of United States registry were required to convey Peruvian mail free of charge by reason of port privileges or other concessions granted them, stating that the Department would not pay compensation for any service performed by such a vessel. Although the reply by the Peruvian officials to this inquiry, if any was received at all, is not in evidence, it may reasonably be inferred from the fact that the Post Office Department made payments to plaintiff for the carriage of Peruvian “Convention mail” for a period of 17 years thereafter, that a determination of this matter satisfactory to the Post Office Department was made.
It may also be pointed out that, in this same inquiry of 1937, the Post Office Department requested the Peruvian postal authorities to furnish each vessel of United States registry transporting Peruvian “Convention mail” with appropriate documents indicating the amount of such mail carried, its destination, etc. The express purpose of this request was stated to be that the information was necessary to enable the Post Office Department to compensate the American companies performing this service. However, on September 3, 1954, the Post Office Department stopped further payment to plaintiff for the carriage of Peruvian “Convention mail” and began to withhold monies otherwise due to plaintiff for the carriage of other mail. The entire amount paid to plaintiff for the carriage of Peruvian “Convention mail” during the preceding 17 years was thus recouped by the Post Office Department. This action was taken when Law 6207 of Peru, which had been promulgated in 1928, came to the attention of the Post Office Department during the course of inquiries it instituted apparently as a result of this court’s decision in Moore-McCormack Lines, Inc. v. United States, 119 Ct. Cl. 473 (1951). Because of the view that this law of Peru compelled plaintiff to transport outbound Peruvian mail gratuitously, the Post Office Department took the position that the United States was not obligated to pay for this service under the “free and gratuitous transit” provisions of the Union and, further, that the *488 payments made to plaintiff since 1937 had been made in error.
This is the factual pattern giving rise to plaintiff’s contention in count I that it is entitled to recover the amount, $460,763.69, previously paid to it by the United States for the carriage of Peruvian “Convention mail” from July 1, 1937, to September 3, 1954, and then subsequently recouped by defendant. We are met at the outset with defendant’s assertion that Law 6207 of Peru, and Article 6 thereof in particular, did in fact require plaintiff’s vessels to transport Peruvian outbound mail gratuitously, and consequently relieved the United States of any duty with respect to such mail under the “free and gratuitous transit” provisions of the Union.
Law 6207 is entitled an act “Establishing The National Coastwise Service” and Article 6 thereof provides:
Article 6. Both the national and foreign navigation companies are under the obligation to carry Peruvian mail between Peruvian ports, and that [mail] destined for abroad, without any charge for this service.
Defendant points to the clause set out in commas, “, and that [mail] destined for abroad,” as supporting its assertion. However, it is obvious that this clause must be construed in the light of its context. The enactment as a whole appears to have been concerned with the establishment of a coastwise maritime service for the benefit of Peru, this being shown by its title and its other provisions. It is set out in full in finding 19. We are of the opinion that it is a local law, dealing particularly with traffic along the coast of Peru, and was not intended to govern the rendition of maritime services between the ports of Peru and those of other nations. We believe Article 6 to be descriptive of two types of mail which must be carried between ports of Peru by vessels of foreign registry, and its operative effect may be illustrated as follows:
A vessel of United States registry traveling from Mol-iendo, Peru, to Callao, Peru, and thence to New York, would be required to transport all Peruvian mail from Moliendo and destined for Callao for distribution in that area free *489 of charge under Article 6. Similarly, a vessel making such a voyage would also be obligated under Article 6 to transport Peruvian mail from Moliendo and destined for New York for distribution there free of charge for that fart of its voyage lying between Moliendo and Callao only; i.e., for that part of the voyage along the Peruvian coast.
Thus, Article 6 would have no bearing upon maritime services performed beyond the coastline of Peru, nor would this be necessary to effectuate the purpose of the enactment to insure that protection needed to encourage the development of a national coastwise maritime service for the benefit of Peru.
The record also indicates that this was the construction of Article 6 actually put into effect by the Peruvian authorities themselves. It may be noted that, although parcel post was not entitled to free transit under the “free and gratuitous transit” provisions of the Union, since it is not “correspondence,” parcel post is, nevertheless, “mail.” Therefore, if the construction of Article 6 urged upon us 'by defendant is correct, we would expect that the Peruvian postal officials would also require plaintiff to transport this class of mail beyond the coastline of Peru free of charge. Yet the record is clear that plaintiff’s vessels have carried parcel post matter outbound from Peru at least since 1937 and that plaintiff has always been paid, and is still being paid, by the Peruvian Postal Administration for the rendition of this service.[1] Again, there is in evidence an opinion of the Fiscal (Attorney General) of Peru dated February 3, 1960, authorizing payment by Peru to plaintiff for the carriage of Peruvian mail after the United States had withdrawn from the “free and gratuitous transit” provisions of the Union. This fact of payment hardly comports with defendant’s conception of the meaning of Article 6.
In view of these considerations, we are of the opinion, and so hold, that Law 6207 of Peru did not require plaintiff’s vessels to carry Peruvian mail beyond the coastline of Peru gratuitously.
*490 Defendant also relies upon a Supreme Resolution of Peru of 1927, a document which was not introduced in evidence, as showing that plaintiff was obligated to convey the Peruvian mail here in issue free of charge in consideration of certain concessions which had been granted to it by the Peruvian government. Aside from the fact that this document is not in evidence, we are of the opinion that it is in-apposite in view of the trial commissioner’s finding' — -which we have adopted — that it was rendered obsolete by subsequent Supreme Resolutions, all promulgated prior to 1987, which imposed no such obligation on plaintiff.[2]
Since we have decided that plaintiff was not obligated under Peruvian law, or by virtue of concessions granted it by the Peruvian government, to transport the Peruvian mail here in issue beyond the coastline of Peru free of charge, we must next consider defendant’s assertion that, in any event, plaintiff is not entitled to the amount sought in count I. It is defendant’s theory that, since the Congress enacted no legislation providing compensation for American flag vessels transporting “Convention mail” and there was no express agreement between these parties providing for such compensation, plaintiff must of necessity be attempting to enforce directly the provisions of the various Conventions of the Postal Union of the Americas and Spain in this court. Defendant therefore strongly urges upon us the fact of plaintiff’s lack of standing to enforce the provisions of a postal convention and this court’s lack of jurisdiction to determine claims based upon treaties with foreign nations.
Interesting though these questions might be, it is not necessary that we consider them now, for it is apparent that plaintiff’s claim in count I is founded upon a contract, implied-in-fact. The facts found by the trial commissioner make clear that plaintiff did not intend to render these maritime services in behalf of the United States gratuitously, nor did the United States have any reason to suspect that they were being rendered gratuitously. On the contrary, the Postmaster General issued orders and rates in 1937 with respect to the payment for the transportation of “Convention mail” by ships of United States registry and did in fact pay *491 plaintiff for the very services here in issue for a period of 17 years.
Moreover, the Beports of the Postmaster General for 1955 and 1956', in discussing the reason for the withdrawal of the United States from the “free and gratuitous transit” provisions of the Union in 1956, clearly recognize the responsibility of the United States to pay its own steamship companies for the maritime services they performed for the other members of the Union.[3] In this connection, we quote from the Beport of 1955 as follows:
This provision [“free and gratuitous transit”] now requires that each country furnish its postal transportation facilities and maritime shipping services free of charge to other member countries. As a consequence, the United States is required to pay its own steamship companies for the service they perform for the other member countries. And as the United States has by far the greater number of ships, this results in disproportionate use of our facilities and the expenditure of approximately $1,200,000 annually. The Department plans to terminate this arrangement in fiscal 1956.
Thus, as late as 1955, the Department still recognized its obligation to compensate plaintiff. It sought to modify the provision because it had so many more ships in the service than the other signatories that it felt it was carrying more than its fair share of the load. The Department’s Beport of 1956 indicates that it followed through on this proposal by formulating a reservation to the “free and gratuitous transit” provisions, thus relieving the United States “of the responsibility for paying our steamship companies for transporting the mail of other PUAS countries and requires member countries to pay the Department for transporting their transit mail across United States territory.”
When the provisions of the Union, the orders of the Postmaster General and the Beports are considered as a whole, it becomes clear that both parties expected that payment would be made to plaintiff for the services involved. Payment was made for 17 years. It is now too late for plaintiff to collect from Peru, even if the legal status of this claim *492 were such, as to permit such a recovery. Plaintiff would thus be left without a remedy.
This conduct on the part of both parties, for this period of time, leaves no doubt that each of them manifested, in deeds if not in words, that assent essential to the establishment of a judicially enforceable promise to pay. Tidewater Coal Exchange, Inc. v. United States, 67 Ct. Cl. 590 (1929); Restatement, Contracts, §21 (1932). Therefore, since the United States has failed to fulfill its promise to plaintiff in this respect, it is our conclusion that plaintiff is entitled to recover the amount sought in count I of its petition.
COUNT rr
Effective March 1, 1956, the United States formulated a reservation to the “free and gratuitous transit” provisions of the Postal Union of the Americas and Spain, thereby terminating its obligation to provide for the transportation of “Convention mail” free of charge by vessels of its flag on behalf of the other members. As we have seen, the Post Office Department had, on September 3,1954, notified plaintiff that the United States would no longer pay compensation to it for the carriage of Peruvian “Convention mail” and had also commenced to withhold other monies otherwise due plaintiff in order to recoup the amount paid for this service during the preceding 17 years.
Nevertheless, plaintiff continued to transport this class of Peruvian mail between September 3,1954, and February 29, 1956, although the United States never made payment, or promised to pay, for these services. This is the basis for plaintiff’s claim in count II of its petition, in the amount of $47,411.83. It is contended that the United States is obligated to compensate plaintiff for these services for the same reason that it is obligated to compensate plaintiff for the services rendered between July 1, 1937, and September 3, 1954.
We do not agree. We have found that the conduct of the United States during the period of time involved in count I was such as to manifest its promise to pay for the maritime services rendered on its behalf by plaintiff. However, a totally different situation obtains in regard to the relation be *493 tween these parties after September 3, 1954. The action of the Post Office Department on that date, when it stopped further payment for the services and began recouping the amount previously paid, must be taken as unequivocal notice to plaintiff that the United States no longer agreed to pay for the maritime seiwices here involved. Plaintiff can point to no act on the part of defendant, either by word or by deed, upon which can be founded an express or implied promise to pay. It must be said, therefore, that plaintiff carried Peruvian “Convention mail” subsequent to September 3,1954, at its own risk, and consequently is not entitled to recover under count II of its petition.
count ra
In the third and final count of its petition, plaintiff complains to us that the United States unlawfully diverted United States mail from its vessels to those of foreign registry between February of 1953 and the end of February 1956. Plaintiff’s claim in this respect is founded upon the Merchant Marine Act of 1936, 49 Stat. 1985, which is the current law directing that United States flag vessels be accorded a preference in the carriage of United States mail. Section 405 (a) of that act provides:
All mails of the United States carried on vessels between ports between which it is lawful under the navigation laws for a vessel not documented under the laws of the United States to carry merchandise shall, insofar as practicable, be carried on vessels of United States registry.
From at least 1923, the Post Office Department accorded a 24-hour preference (which was extended to a 48-hour preference at some time prior to 1953) to United States flag vessels for the carriage of United States mail. In February of 1953, however, the Post Office Department withdrew this preference from those American flag vessels competing with vessels of the other members of the Postal Union of the Americas- and Spain, putting all such vessels on a time-of-arrival parity. This action was taken for the express purpose of taking full advantage of the “free and gratuitous *494 transit” provisions of the Union;[4] that is to say, by withdrawing the preference in this manner, the Post Office Department was then in a more advantageous position to send United States mail free of charge by utilizing vessels flying the flag of another signatory to the Union. This procedure was followed until the end of February 1956, when, by virtue of the withdrawal of the United States from the “free and gratuitous transit” provisions of the Union, there was no longer any economic advantage to denying vessels of United States registry their customary preference. During this period, 85-90 percent of all outbound United States mail was nevertheless loaded on plaintiff’s vessels for carriage, but it is plaintiff’s position that, since it was ready, willing and able to transport 100 percent of this class of mail during this period, the United States has violated its statutory duty under § 405(a) of the Merchant Marine Act of 1936 to grant plaintiff a 100 percent preference. Plaintiff therefore claims the amount it would have earned for the carriage of the additional 10-15 percent of this mail had the United States complied with its statutory duty.
This is apparently the first time a court of law has been called upon to construe the meaning of §405(a). In this connection, we cannot disregard the plain language of that section, for it directs in unequivocal terms that vessels of United States registry be granted a preference for the carriage of United States mail, but only “insofar as practicable.” This clause would certainly seem to imply that the Congress has reposed a measure of discretion in the postal authorities in effectuating the direction contained in the section. Therefore, we cannot say that, as a matter of law, the executive agency charged with the responsibility of seeing to the proper transportation of United States mail ignored the congressional mandate of § 405(a) by providing for the transportation of such mail free of charge to the American taxpayers. Moreover, even if we assume, as plaintiff would have us do, that § 405(a) imposes an ironclad duty upon the Post Office Department to accord a 100 percent preference to United States vessels at all times, it would not follow that plaintiff itself, as opposed to other companies operating *495 American flag vessels, is entitled to such preference at all times. In other words, and leaving aside the element of discretion implicit in the very language of the section, it is difficult to discern in what manner § 405(a) establishes a judicially enforceable right on behalf of this plaintiff as against the United States. In our opinion, the section does not grant a right to any particular organization operating vessels of United States registry to force the United States to grant it a 100 percent preference in the carriage of United States mail. The section appears to be more in the nature of a congressional declaration of policy to guide the Post Office Department in the discharge of its duties. We conclude, then, that plaintiff has shown no basis upon which the relief sought in count III can be granted.
Plaintiff’s request that interest be awarded on the amount of its recovery under count I is denied. 28 U.S.C. § 2516 (a) (1958).
Plaintiff’s claim for relief under count I of its petition will be granted, and its claims for relief under counts II and III will be denied with the petition as to those counts dismissed. Defendant’s counterclaim will be dismissed. Judgment will be entered to that effect in the amount of $460,763.69.
It is so ordered.
Reed, Justice (Bet.), sitting by designation; Dukfee, Judge; Laeamoee, Judge, and Whitakee, Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the briefs and argument of counsel, and the report of Trial Commissioner William E. Day, makes the following findings of fact:
1. The plaintiff is, and during all times material herein was, a corporation organized and existing under the laws of the State of Delaware, having its principal office in New York, New York.
2. Prior to July 1, 1937, and continuously thereafter, except during part of World War II, plaintiff was engaged in the transportation, by vessels registered under the flag of the United States, of passengers, cargo and mail on a trade route between various United States Atlantic ports, par *496 ticularly New York, and ports on the Pacific Coast of South America and Panama, and on a trade route between various United States Atlantic ports, particularly New York, and the Netherlands West Indies, Venezuela, and the north coast of Colombia.
3. At all times involved in this action, the transportation of mail by ships from United States ports to foreign ports was required by law to be performed at rates fixed by the Postmaster General of the United States.
4. For some time subsequent to September 3, 1954, the plaintiff carried United States and foreign transit closed mail in its ships outbound from the United States as to which the defendant refused to pay the sum of $460,763.59 which it admits at pretrial conference is the proper charge for such carriage. What the defendant has done in this connection has been to withhold this amount from plaintiff, because the Post Office officials were of the view that they had erroneously paid that amount for the carnage of mail by the plaintiff’s ships northbound to the United States from the ports of Peru over a period of about 17 years, from July 1, 1937 through September 2, 1954. In addition to withholding the amount referred to above, the defendant, by its counterclaim filed herein, again claims this same amount from the plaintiff.
5. In accordance with Title 5, Sec. 372, of the United States Code, the Postmaster General of the United States negotiated and concluded with the governments of Panama, Colombia, Venezuela, Ecuador, Peru, Bolivia, and Chile, and other governments, postal treaties or conventions known as the Pan American Postal Union, First Congress, Buenos Aires, 1921, and Second Congress, Mexico, 1926, and Postal Union of the Americas and Spain, Third Congress, Madrid, 1931, Fourth Congress, Panama, 1936, Fifth Congress, Rio de Janeiro, 1946, and Sixth Congress, Madrid, 1950. The ports of the foregoing countries are served by plaintiff, except Bolivia which is landlocked and uses the ports of Peru.
6. The amiual report of the Postmaster General for the fiscal year ended June 30, 1921 reads in part as follows:
*497 The Universal Postal Congress convened at Madrid, Spain, on October 1, 1920, and a postal convention was concluded on November 30 following.
The convention provides for maximum and minimum postage rates, the former being new rates of approximately 100 percent increase, and the latter being those of the present, or Eome convention. The gold franc was established as the basis for the rates to be levied and on accounts to be adjusted. A number, of other important changes were made. The convention will become effective on January 1,1922.
Spanish-American Postal Congress
While the sessions of the Madrid Congress were in progress, the delegates thereto from the United States and the Philippines, Spain, and 20 of the Latin-American countries entered into a separate convention (subject to ratification), which provides in the main that the postage rate on letters and post cards from each country to any of the other contracting countries shall be the domestic letter or postcard rate respectively, of the country of origin; and also that each of the contracting countries shall transport freely and gratuitously through its territory and by means of the services maintained by its postal administration or utilized, for the direct dispatch of its own mails the mails received from any of these countries destined to any other..
The second meeting of this congress, to which it is understood all the countries of Pan America had been invited to send delegates, is known as the Pan American Postal Congress, and convened at Buenos Aires on August 25 and adjourned on September 15, 1921, with the signing of a new convention.
The convention provides for a liberal extension of the domestic rates of postage in the Pan American service on letters, post cards and all kinds of printed matter, commercial papers and samples, and for free intermediary transit of mails handled by one contracting country for another. It adopted the American dollar as the monetary standard and provides for the reply coupon service at the reduced postage rates.
The Congress also concluded a parcel-post convention providing for lower and more uniform delivery charges, it being stipulated that the maximum of such charge, not including the regular customs duty, shall be 10 *498 cents, and specifically prohibiting any other charges than those provided therein.
It is believed that the accomplishments of the United States delegates to the Buenos Aires Congress will prove to be greatly advantageous to our commerce and that these conventions will give Pan America postal advantages of special value.
$ H* $ $ $
7. The annual report of the Postmaster General for the fiscal year ended June 30, 1927, reads in part as follows:
PaN AmericaN Postal Union Congress
The Second Congress of the Pan American Postal Union was held at Mexico City from October 15 to November 9, inclusive, 1926, and concluded a principal convention, which provides for the exchange by mail of letters, post cards, prints, commercial papers and samples, a parcel post convention for the exchange of parcel post, and a money order convention, governing the exchange of money orders between the contracting countries. All of these conventions were signed by the delegates of the United States and have since been ratified and made effective.
This international postal organization comprises the following countries: Argentina, Bolivia, Brazil, Colombia, Costa Pica, Cuba, Chile, the Dominican Republic, Ecuador, El Salvador, Spain, the United States, Guatemala, Honduras, Mexico, Panama, Paraguay, Peru, and Uruguay.
Spain is not an American country, and strictly speaking would not be included in the Pan American Postal Union, but the union originated in the concerted efforts of the American countries at the Universal Postal Union Congress of Madrid in 1920 to keep down postage rates, which nearly all the European countries desired to increase as a result of conditions following the World War. Spain joined with the Americas in opposing an increase in rates and as a result was asked to join the new organization, the foundations of which were laid at that time.
The central idea in the union is that the countries composing it form a single postal territory and that the facilities of any one of them are at the disposal of all. This theory is carried to its logical conclusion in the principal convention of Mexico, which provides that the domestic rates of each country shall apply to mail going *499 to all the other countries of the union and that each country shall transport through its territory free of charge mail of any member of the union destined to a third country. Freedom of transit applies even to the sea when ships of a signatory cov/ntry are used*
This freedom of transit between Pan American countries was conceded by the United States in the Buenos Aires convention of 1921, but was expressed in such ambiguous language that differences of opinion arose as to whether the principle applied to all sea transit, to that performed by vessels flying the flag of a contracting country only, or was confined to land transit. The United States delegation succeeded in clarifying the language in the new convention so that there will be no ground for misunderstanding its provisions in the future.
The following are among the provisions of the convention :
The United States, while required to transport the letter mails of other Pan American countries by ships of domestic registry without charge therefor, will receive payment for the cost of such transit when the mails are carried by ships of foreign registry.
*****
8. The Madrid Convention, 1931, of the Postal Union of the Americas and Spain, approved by the President of the United States on February 9,1932, provided:
Article 3
Free and Gratuitous Transit
1. The gratuity of territorial, fluvial and maritime transit is absolute in the territory of the Postal Union of the Americas and Spain; consequently, the countries which form it obligate themselves to transport across their territories and to convey by the ships of their registry or flag which they utilize for the transportation of their own correspondence, without any charge whatsoever to the contracting countries, all that which the latter may send to any destination..
2. In cases of reforwarding, the contracting countries are bound to reforward the correspondence by the ways and means which they utilize for their own dispatches.
This was in effect on July 1,1937.
*500 9. Appendix II to tbe Brief of the United States filed in this court on June 30, 1942 in United Fruit Company v. United States, No. 44232, relates to interpretations of Article 3 of the Madrid Convention and reads in part, as follows:
Appendix II
Interpretations of Article 3 of the Conventions by The United States
Under Authority of U.S.C., Title 5, Section 312, which reads:
For the purpose of making better postal arrangements with foreign countries, or to counteract their adverse measures affecting our postal intercourse with them, the Postmaster General, by and with the advice and consent of the President, may negotiate and conclude postal treaties or conventions, and may reduce or increase the rates of postage or other charges on mail matter conveyed between the United States and foreign countries: Provided, That the decisions of the Postmaster General construing or interpreting the provisions of any treaty or convention which has been or may be negotiated and concluded shall, if approved by the President, be final and conclusive upon all officers of the United States. There have been two official interpretations of Article 3 of the Convention. No. 1 interpretation of Article 3 (approved by the President May 19, 1936) reads as follows:
is interpreted and construed to mean that gratuity of maritime transit does not depend on whether territorial transit is or is not also furnished for the same mails; on the other hand, gratuity of territorial (or fluvial) transit does not depend on whether maritime transit is or is not also furnished for the same mails.
The context of Section 1 above quoted clearly indicates that “and” (underlined) is used disjunctively for “or” and not conjunctively. In other words “and” (underlined) is not used to connect “the countries * * * obligate themselves to transport across their territories” and “to convey by the ships of their registry or flag which they utilize for the transportation of their own correspondence, without any charge * * *” so as to provide that gratuity of maritime transit is contingent on the mails involved being also transported over the territory of the country whose flag is flown by the ships perform *501 ing the maritime transit and that in connection with such territorial transit gratuity of territorial transit in addition to gratuity of maritime transit must be granted by the same Postal Administration to the same mails, or else no gratuity of maritime transit (or territorial transit) is granted.
The context of the said Section 1 clearly shows that the gratuity of transit granted thereby to maritime, territorial and fluvial transit is without any qualification that such gratuity of transit depends on maritime and territorial (and fluvial) transit being furnished for the same mails; this is clearly indicated by the statement in the first phrase of the section, that is, “The gratuity' of territorial, fluvial and maritime transit is absolute * * *” ■ .
No. '2 Interpretation (approved by the President .November 17, 1936) reads: -
is further interpreted and construed to mean that, having ratified the aforesaid Convention after express instruction to its delegates to the Third (Madrid,. 1931) Pan American Postal Congress to concede complete gratuity of transit by ships of American registry to mails of countries of the Pan American Postal Union (name changed to “Postal Union of the Americas and Spain” by the said Madrid, 1931, Congress), as hereinafter set forth (i.e., in translation, from the Documents of the Third Pan American Postal Congress, Madrid, 1931, Minutes of the Seventh Session of the First Committee) , the United States of America thus accepted the interpretation of the rest of the delegations to that Congress and obligated itself to transport free of cost to the country of origin all the mails consisting of articles of correspondence (letters, post cards, prints, commercial papers, samples withoitt value, and small packets) of other Americo-Spanish countries adhering to the Convention in question (for any destination) by steamships of American registry utilized by the United States for the transportation of its own correspondence, regardless of whether or not the conveying steamships of American registry are then under, contract to carry mails of the United States of America and whether or not the foreign mails in question are embarked on such American steamships at a foreign or a United States port and whether or not such mails ever reach a port of the United States or any United States Federal postal agency en route to their destinations.
*502 This interpretation has due regard to the memorandum relative to gratuity of transit which was signed (on their return from Madrid) by the delegates of the United States to the aforesaid Madrid, 1931, Congress, that is, by Mr. W. Irving Glover, then Second Assistant Postmaster General, and Mr. Eugene B. White, then Director of International Postal Service. The memorandum mentioned reads as follows:
“After an extended and thorough consideration and discussion of the free transit provisions (Article 3 of the Convention of the Americas and Spain) the Delegates of the Madrid Congress were in unanimous agreement that all the transportation facilities used by any one postal administration wherever they may reach on land or water are placed freely at the disposition of the administrations of the other signatory countries without charge, except where payment has to be made by the intermediary country for the use of vessels foreign to its flag.”
10. The Universal Postal Union, Convention of Stockholm, 1924, provides in part as follows:
Article 70
Transit Charges
1. Correspondence exchanged in closed mails between two Administrations of the Union, by means of the services of one or several other Administrations (third services), is subject to the payment, to each of the countries traversed or whose services participate in the conveyance, of the transit charges indicated in the following table: * * *
4. Barring contrary agreement, maritime conveyances effected directly between two countries, by means of ships belonging to one of them, as well as conveyances effected between two offices of the same country through the intermediary of services belonging to another country, are considered as third services.
The same provisions were continued in succeeding conventions to date. Under these Conventions of the Universal Postal Union, the United States Post Office Department could have billed, either for collection or for offset, the Postal Administration of Peru for the services of the vessels of the plaintiff had not this right been voluntarily relinquished *503 by the action of the United States in becoming a signatory of the Postal Union of the Americas and Spain providing for “free and gratuitous transit.”
11. From July 1, 1937, until World War II interrupted its service, and from the resumption of its service in 1946, plaintiff carried on the outbound or southbound portion of voyages of its vessels, the mail tendered to it by the United States Post Office Department and it carried on the outbound portion of these voyages, and on the return or northbound portion of these voyages, the mail tendered to it by the postal administrations of Panama, Colombia, Venezuela, Ecuador, Peru, Bolivia, and Chile at their respective ports, which included interport mail and mail destined for the United States and for transit through the United States.
12. From July 1,1937, except for the interruption of service during World War II, plaintiff’s vessels have transported the mail of Panama, Colombia, Venezuela, Ecuador, Bolivia, and Chile continuing through February 29, 1956, and plaintiff was paid by the Post Office Department for the transportation of this mail as “Convention mails” under Orders of the Postmaster General. The same situation obtained with regard to the mail of Peru and the “Convention mails” of Bolivia, Paraguay, and Argentina which transited through Peru until September 3, 1954, at which time the Post Office Department ceased to pay for the transportation by the plaintiff of the mail of Peru and “Convention mails” transiting Peru. The parties agree that the value of services performed by the plaintiff between September 3, 1954, and February 29, 1956, is $47,411.83 under rates fixed by Orders of the Postmaster General, if plaintiff is entitled to be paid for these services.
13. From and after July 1, 1937, the date upon which the Ocean Mail Contracts expired, Orders of the Postmaster General, having the force of statute, have provided payment for the transportation of “Convention mails” by ships of United States registry, without any exception stated whereby payment is to be denied for such transportation of “Convention mails” based upon local laws of the Postal Union of the Americas and Spain countries which were parties to “free and gratuitous transit,” An exception was *504 stated as to compensation for carriage of “Convention mails” when dispatched on ships of the flag of signatory-countries. Title 39, C.F.E. § 95.4 (c), published in Fed. Eeg. December 24,1955, reads in part as follows:
$ $ $ $ *
Other exceptions — (1) Free transit provisions. No compensation will be paid by the United States Post Office Department for the transportation of letters and prints mail originating in the United States or 'countries signatory to the Convention of the Postal Union of the Americas and Spain when dispatched on vessels of the registry or flag of a signatory country. Such conveyance is an obligation of the country in which the vessel is registered in accordance with the free transit provisions of the Convention of the Postal Union of the Americas and Spain. This does not apply to ships of Panamanian registry (with respect to ships which Panama does not use for its own correspondence) or those of the United States and Canadian registry.
^ ‡ ^
14. On June 19, 1937 the following letter was sent to the Administrator General of Posts, Telegraphs and Eadio Telegraphs, Lima, Peru by the Director, Division of International Postal Service, Office of Second Assistant Postmaster General, United States Post Office Department:
By direction of the Postmaster General, I have the honor to refer to the despatch of mails by your Administration on vessels of United States registry under the free transit provisions of the Convention of the Americas and Spain, and to request that beginning July 1, 1937 the conveying Steamship Company at the time of each despatch be furnished with a statement showing separately the net weight of letters and post cards, and the net weight of other articles, excluding parcels post, comprising it, also the port of despatch, the name of the country of origin if other than your own, the port at which mails are destined for discharge, and the name of the country of destination.
It is also requested that these statements be signed by a representative of your Administration, and that in the event similar statements covering mails discharged by a vessel at ports of your country are presented for signature to a representative of your Administration, that the mails shown therein be receipted for.
This request is made as the information desired is necessary in order that compensation may be paid to *505 the steamship companies concerned, as the various contracts under which such service has been performed in the past will expire on June 30 of this year.
Of course, this Department will not pay compensation for any service performed by a Company mat is obligated to convey your mails without charge by reason of port privileges or other concessions granted them. Accordingly, it is requested that you furnish the names of any companies so obligated, who operate vessels of American registry.
Various steamship companies have been instructed to have their agents in your country consult your Administration relative to the securing of this information.
As indicated above, this does not apply to parcel post, it being assumed that your Administration settles direct with the Steamship companies for its conveyance.
15. The answer to the letter quoted in the foregoing finding, if any was received, is not in evidence.
16. Parcel post is not “correspondence” within the meaning of the free transit provisions of the Postal Conventions. The plaintiff has carried parcel post matter outbound from Peru at least since 1937 except during World War II. For this carriage it has submitted invoices to and been paid by Peru, through its Postal Administration. It is still being paid in this manner for this service.
17. From July 1, 1937 until March 1, 1956, the plaintiff carried mail tendered it for carriage by the Peruvian Postal Authorities to the plaintiff’s ports of call. This included not only mail of Peruvian origin, but also mail which other countries had sent through Peru for transshipment. From 1938 to March 1, 1956, the Peruvian Postal Authorities handed to the plaintiff’s responsible ship’s officer completed forms which contained information as to quantities and weights and destination of mail. These forms were in the Spanish language with the legend in English “Transportation Accounts Mails Conveyed under the Free Transit Provisions of the Convention of the Americas and Spain.” The plaintiff submitted public vouchers to the United States Post Office Department on forms printed by the United States Government Printing Office by which it requested payment for the carriage referred to above. The Post Office Department paid the plaintiff for such carriage from July 1, 1937 *506 until September 3, 1954. On that date it stopped further payment for the carriage outbound from Peru of Convention mail and then began to withhold monies otherwise due to the plaintiff for the carriage thereafter of United States mail and foreign closed transit mail outbound from the United States.
18. It appears from the record that the decision by the Post Office Department to stop further payments to the plaintiff for the carriage of mail outbound from Peru resulted from the decision of this court in Moore-McCormack Lines, Inc. 119 Ct. Cl. 473. After this decision had been rendered on stipulated facts, the United States Post Office Department, through the United States Department of State, inquired of various South American countries as to whether there were any local “decrees or laws or regulations” which would require carriage of mail gratuitously by those carrying mail. Law 6207 of Peru came to the attention of the United States Post Office Department. Because of the view that if Peru was not obligated to pay for the carriage of mail outbound from Peru (though this included mail transited through Peru from other countries), then the United States was not so obligated under the Postal Conventions of the Americas and Spain, and further that payments made since 1937 had been made in error, the United States Post Office stopped further payments to the plaintiff on September 3, 1954 and then began to withhold monies otherwise due to the plaintiff.
19. An agreed translation of Law 6207 reads as follows:
ESTABLISHING THE NATIONAL COAST-WISE SERVICE
THE PRESIDENT OE THE REPUBLIC, INASMUCH AS THE CONGRESS HAS ENACTED THE EOLLOWING LAW, THE CONGRESS OF THE REPUBLIC OE PERU HAS ENACTED THE EOLLOWING law:
Article 1. Coastwise traffic on the Peruvian coast is reserved only and exclusively for national flag vessels.
Article 2. Foreign flag vessels may enter the major ports to leave and receive cargo from and to foreign countries; and passengers for any port, either on the coast or in foreign countries.
*507 Article 3. Foreign vessels may call at the minor ports, only to load cargo for foreign countries and discharge cargo from the same points of origin with special permission of the custom house of the nearest port.
Ajrticle 4. National vessels must have a speed of not less than 8 miles per hour, if they are passenger ships; they must maintain a combined itinerary of at least one vessel per week to the South of the Republic and one to the North of the Republic, whose itinerary must be approved by the Government. Likewise, they may not increase their freight and passenger tariffs on the coast without authorization from the Government.
Article 5. National vessels will be received and attended by the authorities in preference over any other vessels.
Article 6. Both the national and foreign navigation companies are under the obligation to carry Peruvian mail between Peruvian ports, and that (mail) destined for abroad, without any charge for this service.
Article 7. Cargo from foreign countries arriving at national ports in Peruvian vessels will be entitled to the privilege of remaining in the custom houses, without paying anything for storage, etc., for a period of 6 months over the time granted cargo arriving on vessels of other nationalities.
Article 8. Peruvian crews are the only ones that may engage in the loading and unloading operations of their vessels on the coastal ports. Foreign flag vessels must use stevedores from the ports of arrival for their loading and discharge operations.
Article 9. Vessels arriving from foreign ports with any contagious or communicable diseases aboard must put in at Paita, Callao or Ilo, whichever is more convenient to them, in order to comply with the sanitary regulations in force. A vessel not complying with these legal regulations, may not be cleared in any other port of the Republic, and if it is it will be subject to a fine of not less than 100,000 pounds Peruvian and not more than 500,000 pounds Peruvian, and the Government employee who authorizes the departure of a vessel that has not complied with the sanitary regulations mentioned above will be discharged and prosecuted by law.
Article 10. The benefits of this law will not be granted to foreign vessels that merely change their flag, and only those vessels will be considered national vessels whose owners are Peruvians who are residents of the *508 Republic, and of at least % of whose officers and crew are Peruvian citizens. If a vessel belongs to a firm, it will be considered Peruvian only if % of its capital belongs to Peruvians, and it complies with the provisions of the preceding article.
Article 11. This law will become effective 6 months after its promulgation.
Article 12. If for any circumstance the commerce of the Coast suffers any detriment because of the present law, the Executive Power is authorized to extend the benefits of the law to any foreign vessel or navigation company for the length of time he considers it convenient.
Ajeiticlb 13. As of the date the present law becomes effective, the National Merchant Marine will form part of the National Reserve.
To be communicated to the Executive Power so that he may resolve the necessary relative to its compliance.
Enacted in the Hall of Sessions of the Congress, Lima, on the 31st day of March of 1928.
Roberto E. Leguia,

President of the Senate

Jesus A. Salazar,

President of the Chamber of Deputies

Ceasar A. Elguera,

Senator Secretary

Eno. Escrxbens Correa,

Deputy Secretary To the President of the República

$ ^ ‡ $
Therefore; I order that this be complied with, numbered, printed, published, circularized and that it be properly executed.
The Government Palace, Lima, 14th May 1928.
A, B. Leguia
J. A. Nunez Chavez
20. There is no disagreement between the parties as to the fact that Law 6207 was in effect during all times material herein. There is sharp disagreement as to its effect, and it will therefore be necessary to resolve as a fact the state of the law of Peru as to whether under its laws, the plaintiff was obligated to carry without pay “Convention mails” shipped outbound from Peru including “Convention mails” *509 from Bolivia, Paraguay and Argentina which had transited Peru and were carried by the plaintiff from Peru.
21. It is clear that the provisions of Law 6207 required the plaintiff’s ships, and the ships of the flag of any other country, to carry mail gratuitously between the ports of Peru. This was and is a local law of Peru dealing particularly with traffic along the coast of Peru. It does not require the plaintiff’s ships to carry mail beyond the coastline of Peru gratuitously. The direction in Article 6 is to carry mail between Peruvian ports. The clause set out in commas “, and that (mail) destined for abroad,” is clearly descriptive of an additional type of mail to be carried free between ports of Peru. There is in evidence, as plaintiff’s exhibit No. 23, a map of Peru which shows roads in existence and proposed as of 1926. This exhibit makes clear that movement of mail along the coastline of Peru could only be accomplished with dispatch by ships since there were no road connections between many Peruvian cities and towns.
22. The defendant apparently relies upon a document, marked for identification as defendant’s exhibit No. 9, which was neither offered nor admitted in evidence. This was a Supreme Resolution of Peru of 1927 by which it was decreed that the plaintiff would be granted certain “immunities”, having to do with arrival and dispatch of its vessels, fumigation, deduction of the lighthouse fees,, of revenue stamps and other exceptions in return for which it remained obligated to transport free of charge the correspondence mail which was sent out by the post offices. It was also obligated to maintain regular itineraries and to allow a 25 percent discount in fares for public employees and in freight carried for Peru.
23. Plaintiff’s exhibits Nos. 14, 15, 16, 17 and 18, which are in evidence are Supreme Resolutions of Peru dated 1928, 1929, (2), 1930 and 1934. The provisions of these exhibits superseded that referred to in the preceding finding, and omitted any requirement for the free carriage of correspondence mail, retaining the requirement of maintenance of regular itineraries and the 25 percent discount for public employees and freight carried for Peru.
*510 24. The Annual Report of the United States Postmaster General for the Fiscal Year Ending June 30, 1955 provides in part as follows:
INTERNATIONAL TRANSPORTATION
The Department will propose to the Postal Union of the Americas and Spain Congress in Bogota, Colombia, October 1955, that the free transit provision of the Convention be made optional to the member countries.
This provision now requires that each country furnish its postal transportation facilities and maritime shipping services free of charge to other member countries. As a consequence, the United States is required to pay its own steamship companies for the service they perform for the other member countries. And as the United States has by far the greater number of ships, this results in disproportionate use of our facilities and the expenditure of approximately $1,200,000 annually. The Department plans to terminate this arrangement in fiscal 1956.
25. The Annual Report of the United States Postmaster General for the Fiscal Year Ending June 30, 1956, reads in part as follows:
International Service Improvements
Several proposals made by our representatives to the Congress of the Postal Union of the Americas and Spain, held in Bogota, Colombia, in October 1955, were adopted. These included:
1. Bulk billing of parcel post, instead of listing each parcel individually.
2. Optional increase of weight limits from 22 to 33 pounds on single packages of printed matter.
3. Elimination of the PUAS international reply coupon, in favor of the standard Universal Postal Union coupon.
Our proposal to make the free transit provisions of the Convention optional was disapproved. Therefore, the United States formulated a reservation which will reduce United States transportation costs by about $1.2 million annually. The reservation relieves the United States of responsibility for paying our steamships for transporting the mail of other PUAS countries and requires member countries to pay the Department for *511 transporting their transit mail across United States territory.
26. Section 405(a) of the Merchant Marine Act of 1936 (49 Stat. 1985,1995) provides as follows:
All mails of the United States carried on vessels between ports between which it is lawful under the navigation laws for a vessel not documented under the laws of the United States to carry merchandise shall, insofar as practicable, be carried on vessels of United States registry.
27. The Annual Eeport of the United States Postmaster General for the Fiscal Year Ending June 30,1923, provides in part as follows:
Foreign Mail Service
The Foreign Mail Service covers all the relations between the United States and foreign countries in the exchange of mails between them.
Every opportunity for the safe and expeditious dispatch of mails to foreign countries is employed. In the assigning of mails for dispatch abroad vessels of American registry are employed in preference to vessels of foreign registry. This preference is limited to 24 hours for American vessels over a competing foreign vessel in the anticipated time of arrival in the port of destination. When the American vessel has sea-post service the preference is extended to 48 hours, because the distribution of mails on board tends to equalize the difference in time of arrival.
28. The Post Office Department accorded a preference to United States flag vessels as expressed in the Postmaster General’s report from at least 1923. The 24-hour preference was extended to 48 hours at some point between 1923 and 1953.
29. Beginning about February 1953, and ending at the end of February 1956 without notice to the plaintiff, the Post Office Department withdrew this preference to United States flag vessels over vessels flying the flags of countries signatory to the Convention of the Postal Union of the Americas and Spain, and sent a substantial quantity of mail by foreign ships which the plaintiff’s ships were ready, able and willing to carry. This denial of preference was carried out by the *512 Post Office Department for the purpose of taking advantage of the “free transit” provisions of the PUAS Convention.
30. Instructions given by the Assistant Postmaster General to the Acting New York Postmaster relating to the matter of preference read as follows:
January 29, 1953
Reference is made to previous instructions regarding “preferences” of 48 hours for letter mails and daily newspapers and 7 days for unimportant prints and parcel post to be allowed United States registry vessels in the dispatch of mails to other countries.
In reviewing this matter it has been decided that in the case of vessels flying the flags of countries signatory to the Convention of the Postal Union of the Americas and Spain _ (these are the vessels for which the weights of the mails, letters and prints, are at present being shown on Form 2963-d), the preference in the dispatch of “letters” and “prints” will not apply. That is, the “letters” and “prints” are to be dispatched by the vessel scheduled to deliver the mails first at destination regardless of registry. This action is to be taken so that we may be m a position to take fuller advantage of the free transit provisions of Article 3 of the Convention mentioned above.
No change is to be made in the preference covering parcel post.
The only exception to the above relates to vessels of Panama registry which are not proceeding to Panama. In such cases the 48-hour preference for vessels of United States registry will still apply.
Please also note that no change is to be made insofar as concerns the preferences covering vessels of other countries which are not signatory to the Convention of the Postal Union of the Americas and Spain; for instance, Sweden, Great Britain, France, etc.
March 27,1953
Reference is made to your further letter (For 407-A 15) dated March 4, 1953 relative to “preferences” in connection with the dispatch of surface mails on vessels flying the flag of countries signatory to the Convention of the Postal Union of the Americas and Spain.
In reviewing our original instructions or January 29, 1953 it appears that some clarification and supplementation is required.
In the case of dispatches via U.S. Flag vessels as against vessels of other signatory countries it is intended that *513 the vessel be used which will make the earliest delivery at port of discharge. For instance, if an Argentine flag vessel were sailing on April 1 and a U.S. flag vessel were sailing on April 2 to the same destination and the Argentine vessel is scheduled to arrive at Buenos Aires on April 17 and the U.S, flag vessel is to arrive there on April 18, then all letters and prints available for dispatch on April 1 are to go forward on the Argentine vessel. Formerly they would be held for the U.S. vessel because of the 48 hour preference.
In the case of vessels of signatory countries versus non-signatory countries, preference of 48 hours for letters and daily newspapers and 7 days for unimportant prints is to be given the signatory vessel. In other words, signatory vessels will have the same preference as U.S. flag vessels over vessels of non-signatory countries insofar as letters and prints are concerned.
These changes in preferences do not apply to parcel post; the present 7 days preference to U.S. flag vessels to continue.
With regard to the use of Canadian registry vessels this is to confirm that such vessels are to be treated the same as vessels of non-signatory countries inasmuch as the free transit provisions are not applicable between our two Administrations,
December 22,1954
In connection with the dispatch of foreign closed transit regular mails (Letters and Prints) originating in the countries of the Postal Union of the Americas and Spain (Mexico, Cuba, etc.), advantage is to be taken of sailings of vessels of Postal Union of the Americas and Spain countries (Argentina, Brazil, etc.) when delivery can be made at destinations at approximately the same time as delivery would be made by vessels of United States registry. In this connection reference is had to my letter on the subject of preferences dated March 27, 1953.
When vessels of Postal Union of the Americas and Spain registry (other than the United States) are not available for the dispatch of foreign closed transit regular mails (Letters and Prints) originating in the countries of the P.U.A.S., but where there are United States registry vessels and vessels of non-P.U.A.S. signatory countries in competition with each other, such closed transit mails should be dispatched on the vessels of non-P.U.A.S. signatory countries, such as Norwegian regis *514 try, instead of vessels of United States registry if delivery can be made at ports of discharge earlier or about the same time as delivery would be made if dispatched by United States registry vessels. In such cases the preferences given United States registry vessels will not be applicable.
This procedure is to be followed as the United States is reimbursed by the P.U.A.S. countries of origin for such regular mails dispatched on non-P.U.A.S. registry vessels.
31. On February 21, 1956, the Director, International Service, United States Post Office, Bureau of Transportation, wrote to the Postmasters at New York and New Orleans, in part, as follows:
Effective March 1, 1956, the “free transit” provisions of the Convention of the Postal Union of the Americas and Spain will no longer be operative insofar as the United States is concerned. Hence certain changes are necessary in the submission of the above-named reports on and after that date.
*****
Unless you are advised to the contrary prior to March. 1, 1956, on and after that date ships of United States registry serving ports in countries that are members of the Postal Union of the Americas and Spain will be accorded the same preference as other United States flag ships; i.e., 2 days for letters and preferential prints and 7 days for non-preferential prints and parcel post. (This supersedes our letters of March 30, 1953 and December 22, 1954).
32. If the Post Office Department had continued to accord the plaintiff’s vessels the usual preference over foreign flag ships, the plaintiff’s vessels would have carried a total of at least 5,086,000 pounds of mail, including 161,000 pounds of parcel post to its regular ports of call in South America. Of the former figure 4,055,000 pounds were United States mail and 869,000 pounds were Foreign Transit Closed mail. The plaintiff would have received for this carriage, $256,179.01.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter *515 of law that plaintiff is entitled to recover under count I of its petition, and it is therefore adjudged and ordered that plaintiff recover of and from defendant the sum of four hundred sixty thousand, seven hundred sixty-three dollars and sixty-nine cents ($460,763.69).
It is further concluded that plaintiff is not entitled to recover under counts II and III of its petition, and that defendant is not entitled to recover on its counterclaim. Therefore the petition as to counts II and III, and defendant’s counterclaim are dismissed.

 See finding 16.

 See findings 22 and 23.

 See findings 24 and 25.

 See finding 30.

ItaHcs not in original.