WhttakeR, Judge,
delivered the opinion of the court:
This is a suit to recover compensation for the carriage of mails from ports on the east coast of South America to ports on the Atlantic coast of the United States. Plaintiff, a steamship company, whose vessels fly the flag of the United States, is the same corporation as was the plaintiff in Moore-McCormack Lines, Inc. v. limited States, 119 Ct. Cl.473, cert. denied, 342 U.S. 876. In that suit plaintiff sought to recover *262 compensation for tbe carriage of outbound mails from ports of Argentina, Brazil, and Uruguay for years prior to 1942, at which time plaintiff’s service was interrupted because of World War II.
In the earlier suit the entire claim as to the northbound mails from Argentina and part of the claim as to northbound mails from Uruguay were abandoned by plaintiff, pursuant to a stipulation between the parties, under which it was agreed that, since Argentina and, until 1940, Uruguay, required plaintiff to carry their mails without further charge, in consideration of the granting by those countries of certain packet privileges to plaintiff, no payment was due from the United States for the carriage of Argentine mails and, for the period prior to 1940, of Uruguayan mails. In 1940 Uruguay had suspended its packet privilege law, thereby relieving the plaintiff from the obligation of carrying its mails without charge and, hence, for the period subsequent to 1940 the United States conceded liability, under the Postal Union Convention, to pay the charges.
The parties also agreed that, if a Brazilian decree of June 3, 1941, required plaintiff to carry Brazilian mails gratuitously, then the United States was not liable to compensate plaintiff therefor. We construed the Brazilian decree as requiring the gratuitous carriage of the mails; hence, we held, pursuant to the stipulation, the United States was not liable for the carriage of these mails during the period this decree was in effect.
In Count I of its petition in this action plaintiff seeks to recover from the United States compensation for the carriage of outbound mails from ports of Argentina, Brazil and Uruguay for years subsequent to World War II, beginning in 1946 when plaintiff’s service was resumed, and ending on March 1, 1956, when the United States withdrew from the Postal Union.
In Count II plaintiff sues to recover expenses incurred in the cartage of incoming South American mails from its piers to post offices in the United States.
Count III is a claim for money plaintiff says it would have received for the carriage of mails had not the Post Office Department improperly diverted such mails to foreign ves- *263 seis. Plaintiff says this was in violation of section 405(a) of the Merchant Marine Act of 1936, 49 Stat. 1985, which gave its vessels preference over those of foreign registry.
COUNT x
Except for the years 1942 through 1946, during which plaintiff’s vessels were operated by the United States, pursuant to requisition for use during World War II, plaintiff has been continuously engaged for many years in the carriage of mails between the ports of Eio de Janeiro, Brazil; Buenos Aires, Argentina; and Montevideo, Uruguay, and various ports on the Atlantic coast of the United States, particularly New York, on vessels flying the flag of the United States.
In accordance with 5 U.S.C. § 372, the Postmaster General of the United States negotiated and concluded with the governments of certain Central and South American countries, including that of Argentina, Brazil and Uruguay, several postal conventions, which, beginning with the Second Congress of the Pan American Postal Union held in Mexico in 1926, became known as the Postal Union of the Americas and Spain.
The Convention of the Postal Union of the Americas and Spain of December 22,1936, ratified by the Postmaster General on August 12, 1937, and approved by the President on August 20,1937 (50 Stat. 16'57), provided in part:
ARTICLE 3
Free and gratuitous transit
1. The gratuity of territorial, fluvial and maritime transit is absolute in the territory of the Postal Union of the Americas and Spain; consequently, the countries which form it obligate themselves to transport across their territories and to convey by the ships of their registry or flag which they utilize for the transportation of their own correspondence, without any charge whatsoever to the contracting countries, all that which the latter may send to any destination.
2. In cases of reforwarding, the contracting countries are bound to reforward the correspondence by the ways and means which they utilize for their own dispatches.
*264 This provision was incorporated without change in the Postal Convention of September 25, 1946, ratified by the Postmaster General on February 20, 1947, and approved by the President on February 27,1947 (61 Stat. 3505).
The Postal Convention of November 9, 1950, ratified by the Postmaster General on June 7,1951, and approved by the President on June 22,1951, provided in part:
ARTICLE 3
Free and gratuitous transit
1. The gratuity of territorial, fluvial and maritime transit is absolute in the territory of the Postal Union of the Americas and Spain; consequently the countries which form it obligate themselves to transport across their territories and to convey by ships of their registry or flag, without any charge to the contracting countries, all the correspondence which the latter may send to any destination whatsoever. However, this gratuity of transit will not be applied to the subsequent maritime transmissions of correspondence destined for a third country which is not a member of the Postal Union of the Americas and Spain in cases where a reshipment or transfer may be necessary, or justified expenses of handling may arise.
2. Likewise, when services of foreign Administrations are required for the subsequent conveyance of the closed mails, collection can be made from the Administrations of origin of the same amounts which the intermediary Administrations may be compelled to pay therefor.
3. In cases of onward dispatch, the contracting countries bind themselves to forward the correspondence by the most rapid ways and means which they utilize for their own mails.
« $ $ $ $
The obligation of the United States to compensate plaintiff for the carriage of the mails in question, if any, arises under these postal conventions.
Plaintiff says that the United States, acting through the Postmaster General, by entering into the various postal conventions providing for “free and gratuitous transit” of convention mails on vessels of its flag and by the issuance of orders providing for payment for the carriage of such mails *265 by vessels of its flag, impliedly agreed to compensate plaintiff for tbe carriage of tbe mails in issue.
On tbe other band, since and before the decision in the first Moore-McCormack case, it has been defendant’s position that where the local law of a country signatory to the conventions imposes upon a steamship company the obligation of carrying its mails without further compensation, in exchange for the granting of packet privileges for the company’s vessels, the United States is relieved of its obligation to pay for the carriage of such mails. For the years involved in this action, defendant contends that under the local laws of Argentina, Brazil and Uruguay, plaintiff was required to carry their mails gratuitously in exchange for packet privileges or other preferred treatment for its vessels.
In the earlier suit plaintiff abandoned its entire claim for the carriage of Argentine mails and that part of its claim for the carriage of Uruguayan mails during the period that country’s local packet laws were in force. We were, consequently, not called upon to decide how the local laws of those two countries affected the obligation of the United States. For this reason the prior action is not res adjudicaba, as to plaintiff’s claim for the carriage of Argentine mails and Uruguayan mails.
The only question before us in the former suit was whether or not a Brazilian decree of June 8,1941, required plaintiff to carry Brazilian mails gratuitously in return for certain privileges. We held that the decree did require plaintiff to carry the mails of that country without compensation in exchange for preferred berthing rights and exemption from lighthouse dues and local taxes. Plaintiff now says that as the result of the adoption of a new constitution by Brazil in 1946, that country could no longer constitutionally require plaintiff to carry its mails gratuitously. If so, then the former decision is not res adjudicaba as to plaintiff’s claim for the carriage of Brazilian mails in this action.
Since there was no express contract between plaintiff and the United States, in order to recover, plaintiff must show that there was an an agreement implied-in-f act on the part of the United States to pay for the carriage of the mails involved. Grace Line, Inc., v. United States, 155 Ct. Cl. 482. *266 No contract can be implied for payment by the United States if plaintiff has already been paid for the carriage of the mails by the countries which demanded plaintiff’s services. Plaintiff cannot collect twice for the rendition of the same services.
The crucial inquiry then is: Did plaintiff receive packet privileges or other preferred treatment for its vessels in return for which it assumed the obligation of gratuitously carrying the mails of Argentina, Brazil and Uruguay ?
Since the burden is on plaintiff to show there was an implied contract under which the United States agreed to pay it for the carriage of these mails, it must show that it has not been compensated for the carriage of them by the acceptance of packet privileges, the granting of which obligated plaintiff to carry them without further compensation. This requires plaintiff to show what the law of these three countries is with respect to packet privileges, or to show that it did not receive packet privileges or other remuneration from the countries demanding that it carry their mails. Foreign law must be proved as any other fact. Cuba R.R. Co. v. Crosby, 222 U.S. 473.
That this burden is on plaintiff is particularly true in this case, in view of our prior decision in Moore-McCormack Lines Inc., v. United States, supra, wherein it was stipulated the receipt of packet privileges precluded recovery under the laws of Argentina and Uruguay, and wherein we held this likewise precluded recovery under the laws of Brazil. Plaintiff was thus on notice that the United States would refuse to pay for the carriage of these mails, if this situation continued.
We shall consider first plaintiff’s claim for the carriage of Argentine mail.
Plaintiff did nothing to carry its burden of proving that Argentina did not require it to carry the mail of that country gratuitously in exchange for packet privileges. On the contrary, there is in evidence, as defendant’s exhibit 11, a pamphlet in Spanish entitled “Digesto Marítimo Y Fluvial” relating to packet privileges. According to the witness, Mr. Bosch, counsel for the Consulate General of Argentina in New York, by whom it was identified, it was issued by the Maritime National Prefecture, an agency of the executive *267 department of the Argentine Government. The witness testified that this pamphlet was an official publication of the Argentine Government. In support of this statement he said the document carried on the cover and flyleaf the heading, “Republic of Argentina, Maritime National Prefecture,” and It bore the seal of the Republic of Argentina. The document was also prefaced by decree No. 125.571 issued by the President of Argentina on February 16, 1938,[1] which fact further supports the statement of the witness.
Plaintiff does not show that this was not a valid and binding regulation of the Government of Argentina.
Article 421 of the “Digesto Maritimo Y Fluvial”, as translated into English by Mr. Bosch, reads in part as follows:
All foreign ships with postal packet privilege shall be subject to the following obligations: (A) to carry gratuitously the mail and postal matter delivered to them by the general post office and telegraph for their ports in their itinerary or for the ports which they shall come to in transit.
Plaintiff’s contention that there was no packet privilege law in Argentina is plainly untenable. This was recognized in the letter of Albert F. Crystal, plaintiff’s vice president to the Assistant Postmaster General, dated January 27,1956, requesting that plaintiff be designated a “third service”, the meaning and effect of which is not pertinent here. In his letter Crystal stated, “In Argentina no payment for postal transportation can be expected because of a local postal packet privilege law.” Plaintiff thus acknowledged the existence of such a law. In fact, during 1948, plaintiff actually applied for and was granted postal packet privileges for its steamships, “Argentina”, “Brazil”, and “Uruguay”.
Not only has plaintiff failed to prove it did not receive packet privileges from Argentina in return for the gratuitous carriage of its mails, but the defendant’s evidence is unchallenged, and, being unchallenged, it affirmatively establishes the fact that plaintiff was obligated to carry the mails of that country gratuitously, in exchange for the granting of packet privileges for its vessels.
*268 We cannot agree with the Trial Commissioner that “there is no satisfactory evidence in the record that Argentina, under its laws, required ships flying the flags of countries signatory to the Postal Convention of the Americas and Spain to carry mail without compensation in exchange for the granting by Argentina of packet privileges.”
We turn now to plaintiff’s claim for the carriage of Uruguayan mails.
As in the case of Argentine mails, plaintiff has done nothing to show it did not receive packet privileges from Uruguay and that receipt of them did not obligate it to carry Uruguay’s mails without further compensation.
However, there are in evidence two decrees issued by the President of the Republic of Uruguay, one issued on November 7, 1946, and the other issued on January 8, 1952. The witness Bosch testified that both are valid and existing laws in Uruguay, binding upon aliens doing business in Uruguay.
Although no translation of the 1946 decree from Spanish is in evidence, the translation of the 1952 decree into English is in evidence. In Article Io of the latter decree the President of Uruguay decreed:
That the Regulations for the Concession of Patents of Packet Privileges be approved as worded in administrative documents Series * * * in substitution of the actual Regulations for Packet Privileges approved by Decree N° 8011 of 7th November, 1946.
Article 11 provides:
All national or Foreign vessels holding Packet Privileges of Category “A”, or whose Petition for same is under consideration, or as the case may be, their Agents’, are subject to the following obligations:
a) To carry free of charge all Mails and Parcel Post packages delivered to them by the General Postal Authorities for the ports of their itinerary or ports of call in transit. — It is understood that this obligation applies exclusively to Mails and Parcel Post from or for ports of the Republic * * *.
It is unnecessary for us to consider the different categories of packet privileges under this decree, since Article 12 makes Article 11, clause a) applicable to vessels holding Category B packet privileges, and Article 13 requires vessels holding *269 Category C packet privileges to carry the mails free of charge as in the case of vessels holding Category B packet privileges.
In the letter of Jannary 27,1956, from plaintiff’s vice president to the Assistant Postmaster General, which we referred to in regard to the claim for the carriage of Argentine mails, it is stated: “Our representatives in Uruguay have advised that the local postal administration under local laws will not pay us for any postal transportation.” Plaintiff thus recognized that it would not be compensated for the carriage of the Uruguayan mails in issue, except by the grant of packet privileges. During the period involved in this suit, plaintiff applied for and was granted packet privileges for 17 of its vessels.
We think the evidence establishes the fact that plaintiff was obligated to transport the Uruguayan mails “free of charge” in return for the packet privileges it applied for and received. Hence, plaintiff is not entitled to recover for the carriage of the Uruguayan mails.
As to the Brazilian mails, plaintiff says that any law requiring it to carry these mails gratuitously was in violation of a new constitution adopted by Brazil in 1946. It also says that in the earlier Moore-McCormack case, supra, the court construed an executive decree issued in 1941, while in this case a.1951 executive decree is involved.
With reference to plaintiff’s contention that the provision for gratuitous carriage of its mails is unconstitutional, in the first place, we would be loathe to say that any decree or legislative enactment of a foreign country contravened the constitution of that country. Certainly we would not say so where the law had not been declared to be unconstitutional by authorities in that country with power to do so.
But, apart from this, it seems plain that the Executive Decree, which obligates plaintiff to carry Brazilian mails without further compensation beyond the receipt of packet privileges, does not violate that provision of the Brazilian Constitution upon which plaintiff relies. It is a provision similar to the provision of the Constitution of the United States, which prohibits the taking of private property without compensation. The decree does provide for compensa *270 tion for the service demanded, as we said in our opinion in the former case. We there said:
The obligation cast upon carriers such as plaintiff by this decree was not without consideration. It was an obligation imposed in return for the grant of certain packet privileges. Among these privileges were exemption from lighthouse dues, charity taxes imposed on each sailor and officer, and the grant of preferred berthing rights. By the acceptance of those privileges plaintiff obligated itself to carry Brazilian mails gratuitously * * *. [119 Ct. Cl. 484.]
The 1951 decree was essentially a rewrite of the 1941 decree; the 1951 decree did not change the law as contained in the 1941 decree. Consequently, insofar as the claim for the carriage of Brazilian mails is concerned, our prior holding as to the effect of Brazilian law is controlling in this action.
There is no evidence in the record of whether plaintiff actually applied for or received packet privileges or other preferred treatment for its vessels from the Brazilian Government during the period for which payment is sought for the carriage of the mails. But, as in the case of plaintiff’s claims for the carriage of Argentine and Uruguayan mails, plaintiff has the burden of proving that there was an implied promise by the United States to compensate it for the carriage of the mails of Brazil. In order to establish this, it was necessary for plaintiff to prove that it has not received compensation for the carriage of such mails. Not having proved this, plaintiff has not shown that any payment for the carriage of the Brazilian mails is due from the United States. It follows that plaintiff cannot recover for the carriage of these mails.
COUNT n
This is a claim for the expenses incurred by plaintiff in transporting incoming South American mails from its piers to post offices in the United States.
Since we have found under Count I that plaintiff has already been compensated for the carriage of these mails, it is clear that plaintiff cannot recover for the trucking of the mails from its piers to the post offices.
The carriage of the mails for which plaintiff has been compensated begins with the delivery of the mails to plain *271 tiff’s vessels by the postal authorities of the country concerned and ends with the delivery of those mails to the United States postal authorities. It is inconceivable to us that the South American postal authorities, when they tendered their mails to plaintiff, could have contemplated that their mails would be brought to plaintiff’s piers and left there. They had to be delivered to the Post Office. Cf. United Fruit Co. v. United States, 153 Ct. Cl. 1, 288 F. 2d 489, cert. denied 368 U.S. 818.
COUNT in
In Count III plaintiff seeks to recover compensation it says it would have otherwise been entitled to had it been granted the preference required by section 405(a) of the Merchant Marine Act of 1936, supra, which provides that “insofar as practicable” all mails of the United States shall be carried on vessels of United States registry.
In Grace Line, Inc. v. United States, supra, we held that section 405 (a) does not grant a right to any particular organization operating vessels of United States registry to force the United States to grant it a 100 percent preference in the carriage of United States mails, but that the section appears to be more in the nature of a congressional declaration of policy to guide the Post Office Department in the discharge of its duties. That decision is controlling here and we hold that plaintiff has shown no basis for recovery under Count III.
Plaintiff’s petition will, therefore, be dismissed.
It is so ordered.
Reed, Justice (Bet.), sitting by designation; Dueeee, Judge; Laramore, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner William E. Day, and the briefs and argument of counsel, makes findings of fact as follows:
1. At all times material herein plaintiff was, and is, a corporation organized and existing under the laws of the State of Delaware. Plaintiff is the same corporation as was plaintiff in Moore-McCormack Lines, Inc. v. United States, No. 46280, 119 Ct. Cl. 473, cert. denied, 342 U.S. 876.
*272 2. At all times material herein plaintiff, beginning in 1946, was engaged in the transportation, by ships registered under the flag of the United States, of passengers, cargo and mail on a trade route between various United States Atlantic ports, particularly New York, and ports on the east coast of South America, more particularly Montevideo, Buenos Aires, Santos, Bio de J aneiro, Bahia, and Belem among others.
3. Beginning in the year 1946 and continuing through February 29, 1956, plaintiff was tendered by the Post Office Department and carried United States mails southbound to the ports of Bio de J aneiro, Brazil; Buenos Aires, Argentina ; and Montevideo, Uruguay; from the port of New York on vessels documented under the laws and carrying the flag of the United States, and was paid for the carriage, all pursuant to the postal laws and regulations.
4. Plaintiff commenced the service described in the foregoing findings 2 and 3 in the year 1939 and continued it through part of 1942 until its vessels were requisitioned by the United States during World War II. Plaintiff’s vessels resumed the suspended service in the year 1946 and has continued it to the present time.
5. In accordance with 5 U.S.C. § 372, the Postmaster General of the United States negotiated and concluded with the governments of Panama, Colombia, Venezuela, Ecuador, Bolivia, Peru, Chile, Brazil, Uruguay, Argentina, Paraguay and other governments, postal conventions known as the Pan American Postal Union, First Congress, Buenos Aires, 1921, and Second Congress, Mexico, 1926, and Postal Union of the Americas and Spain, Third Congress, Madrid, 1931, Fourth Congress, Panama, 1936, Fifth Congress, Bio de Janeiro, 1946, and Sixth Congress, Madrid, 1950. The ports of Brazil, Uruguay and Argentina are served by plaintiff; Paraguay, which has river ports only, is served by the plaintiff through the port of Buenos Aires, Argentina.
6. Article 3 of the Convention of the Postal Union of the Americas and Spain, signed at Madrid on November 10, 1931, and approved by the President on February 9, 1932, (47 Stat. 1925), provided in part as follows:
*273 ARTICLE 3
Free and gratuitous transit
1. The gratuity of territorial, fluvial and maritime transit is absolute in the territory of the Postal Union of the Americas and Spain; consequently, the comtries which form it obligate themselves to transport across their territories and to convey by the ships of their registry or flag which they utilize for the transportation of their own correspondence, without any charge whatsoever to the contracting countries, all that which the latter may send to any destination. [Italics supplied.]
2. In cases of reforwarding, the contracting countries are bound to reforward the correspondence by the ways and means which they utilize for their own dispatches.
* * * * *
7. Article 3 of the Convention of the Postal Union of the Americas and Spain, signed at Panama on December 22, 1936, ratified by the Postmaster General on August 12,1937, and approved by the President on August 20,1937 (50 Stat. 1657), was identical to Article 3 of the 1932 Convention as quoted in finding 6.
8. Eesolutions of The Fourth Americo-Spanish Postal Congress, 50 Stat. 1691, provided in part as follows:
$ $ ‡ $
IV
That they try to obtain from steamship companies of countries foreign to the Postal Union of the Americas and Spain which transport their correspondence a reduction in the present rates, and their agreement in no case to collect a sum per weight-unit greater than that which they collect from the country of origin, except in cases where, due to packet or other privileges, said companies are obligated to perform gratuitous transportation.
«i» ^
9.Article 3 of the Convention of the Postal Union of the Americas and Spain, signed at Rio de Janeiro, September 25, 1946, ratified by the Postmaster General, February 20, 1947, and approved by the President, February 27,1947 ( 61 Stat. 3505), was identical to Article 3 of the 1932 Convention, as quoted in finding 6.
*274 10. Article 3 of the Convention of tlie Postal Union of the Americas and Spain, signed at Madrid on November 9, 1950, ratified and approved by the Postmaster General on June 7, 1951, and approved by the President on June 22, 1951, provided in part as follows:
ARTICLE 3
Free and gratuitous transit
1. The gratuity of territorial, fluvial and maritime transit is absolute in the territory of the Postal Union of the Americas and Spain; consequently the countries which form it obligate themselves to transport across their territories and to convey by ships of their registry or flag, without any charge to the contracting countries, all the correspondence which the latter may send to any destination whatsoever. However, this gratuity _ of transit will not be applied to the subsequent maritime transmissions of correspondence destined for a third country which is not a member of the Postal Union of the Americas and Spain in cases where a reshipment or transfer may be necessary, or justified expenses of handling may arise.
2. Likewise, when services of foreign Administrations are required for the subsequent conveyance of the closed mails; collection can be made from the Administrations of origin of the same amounts which the intermediary Administrations may be compelled to pay therefor.
3. In cases of onward dispatch, the contracting countries bind themselves to forward the correspondence by the most rapid ways and means which they utilize for their own mails.
‡ ‡ $
11. Appendix II to the brief of the United States filed in this court on June 30, 1942, in United Fruit Company v. United States, No. 44232, 103 Ct. Cl. 303, relates to interpretations of Article 3 of the Madrid Convention and reads in part, as follows:
APPENDIX II
Interpretations of Article 3 of the Conventions by The United States
Under Authority of U.S.C., Title 5, Section 372, which reads:
*275 For the purpose of making better postal arrangements with foreign countries, or to counteract their adverse measures affecting our postal intercourse with them, the Postmaster General, by and with the advice and consent of the President, may negotiate and conclude postal treaties or conventions, and may reduce or increase the rates of postage or other charges on mail matter conveyed between the United States and foreign countries: Provided, That the decisions of the Postmaster General construing or interpreting the provisions of any treaty or convention which has been or may be negotiated and concluded shall, if approved by the President, be final and conclusive upon all officers of the United States. There have been two official interpretations of Article 3 of the Convention. No. 1 interpretation of Article 3 (approved by the President May 19, 1936) reads as follows:
is interpreted and construed to mean that gratuity of maritime transit does not depend on whether territorial transit is or is not also furnished for the same mails; on the other hand, gratuity of territorial (or fluvial) transit does not depend on whether maritime transit is or is not also furnished for the same mails.
The context of Section 1 above quoted clearly indicates that “and” (underlined) is used disjunctively for “or” and not conjunctively. In other words “and” (underlined) is not used to connect “the countries * * * obligate themselves to transport across their territories” and “to convey by the ships of their registry or flag which they utilize for the transportation of their own correspondence, without any charge * * ” so as to provide that gratuity of maritime transit is contingent on the mails involved being also transported over the territory of the country whose flag is flown by the ships performing the maritime transit and that in connection with such territorial transit gratuity of territorial' transit in addition to gratuity of maritime transit must be granted by the same Postal Administration to the same mails, or else no gratuity of maritime transit (or territorial transit) is granted.
The context of the said Section 1 clearly shows that the gratuity of transit granted thereby to maritime, territorial and fluvial transit is without any qualification that such gratuity of transit depends on maritime and territorial (and fluvial) transit being furnished for the same mails; this is clearly indicated by the statement in the first phrase of the section, that is, “The gratu *276 ity of territorial, fluvial and maritime transit is absolute * * *”
No. 2 Interpretation (approved by the President November 17, 1936) reads:
is further interpreted and construed to mean that, having ratified the aforesaid Convention after express instruction to its delegates to the Third (Madrid, 1931) Pan American Postal' Congress to concede complete gratuity of transit by ships of American registry to mails of countries of the Pan American Postal Union (name changed to “Postal Union of the Americas and Spain” by the said Madrid, 1931, Congress), as hereinafter set forth (i.e., in translation, from the Documents of the Third Pan American Postal Congress, Madrid, 1931, Minutes of the Seventh Session of the First Committee) , the United States of America thus accepted the interpretation of the rest of the delegations to that Congress and obligated itself to transport free of cost to the country of origin all the mails consisting of articles of correspondence (letters, post cards, prints, commercial papers, samples without value, and small packets) of other Americo-Spanish countries adhering to the Convention in question (for any destination) by steamships of American registry utilized by the United States for the transportation of its own correspondence, regardless of whether or not the conveying steamships of American registry are then under contract to carry mails of the United States of America and whether or not the foreign mails in question are embarked on such American steamships at a foreign or a United States port and whether or not such mails ever reach a port of the United States or any United States Federal postal agency en route to their destinations.
This interpretation has due regard to the memorandum relative to gratuity of transit which was signed (on their return from Madrid) by the delegates of the United States to the aforesaid Madrid, 1931, Congress, that is, by Mr. W. Irving Glover, then Second Assistant Postmaster General, and Mr. Eugene R. White, then Director of International Postal Service. The memorandum mentioned reads as follows:
“After an extended and thorough consideration and discussion of the free transit provisions (Article 3 of the Convention of the Americas and Spain) the Delegates of the Madrid Congress were in unanimous agreement that all the transportation facilities used by any one postal administration wherever they may reach on land *277 or water are placed freely at the disposition of the administrations of the other signatory countries without charge, except where payment has to be made by the intermediary country for the use of vessels foreign to its flag.”
12. Pertinent provisions of orders of the Postmaster General as to payment for carriage of mail are quoted below:
OFFICE OF THE POSTMASTER GENERAL,
Washington, May 12,1931.
AMENDMENT TO THE POSTAL LAWS AND REGULATIONS
Order No. 10387.
Paragraph 2, Section 2242 of the Postal Laws and Regulations, is amended to read as follows, effective July 1,1937:
“2. Unless otherwise specifically provided, payment shall be made for the transportation of United States mails and foreign closed transit mails on steamships of both United States registry and foreign registry at the rates of 5.25 cents a pound for mails consisting of letters and post cards and 0.7 cents a pound for mails consisting of other articles, including parcel post, for distances up to 300 nautical miles; 14 cents a pound for mails consisting of letters and post cards and 1.75 cents a pound for mails consisting of other articles, including parcel post, for distances from 300 up to 1,500 nautical miles, and 21 cents a pound for mails consisting of letters and post cards and 2.8 cents a pound for mails consisting of other articles, including parcel post, for all distances exceeding 1,500 nautical miles.”
Paragraph 3 of said section is omitted, and present paragraphs 4 and 5 are renumbered 3 and 4, respectively, effective July 1,1937.
JAMES A. FARLEY,

Postmaster General.

INSERT NO. 443. ORDER NO. 12598. FEBRUARY 21, 1939.
Effective March 1,1939, the Postal Laws and Regulations are amended so as to omit present paragraphs 3 and 4 from Section 2242, and substitute therefor new paragraph 3, as follows:
“3. As an exception to the rates specified in paragraph 2 of this section, payment shall be made at the rates specified in the schedule stated below (unless service be covered by contract), for service by vessels of United States registry and by vessels of foreign registry which *278 are entitled to pay from the United States, in transporting mails the United States is obligated to convey, that may be performed:
$ $ $ $ $
“ (b) From any port in the countries signatory to the Conventions of the Postal Union of the Americas and Spain (except continental United States, Canada, and Spain) to any other port (except ports in continental United States, Canada, and Spain); also from ports in the West Indies or South America of countries not signatory to the Conventions of the Postal Union of the Americas and Spain, to any other port (except ports in continental United States, Canada, and Spain), covering regular mails originating in signatory countries;
*****

‡ ‡
INSERT NO. 447. ORDER NO. 12755. APRIL 7, 1939.
Order No. 12598 of February 21, 1939, substituting new paragraph 3 to section 2242 of the Postal Laws and Eegulations, is modified so as to have subparagraph (b) of said paragraph 3 read as follows:
“ (b) From any port in the countries signatory to the conventions of the Postal Union of the Americas and Spain (except continental United States, Canada, and Spain, and Havana, Cuba, for mails forwarded from continental United States for transshipment) to any other port (except ports in continental United States, Canada, and Spain, azid Havana, Cuba, for mails destined to the United States); also from ports in the West Indies or South America of countries not signatory to the conventions of the Postal Union of the Americas ard Spain, to any other port (except ports in continental United States, Canada, and Spain, and Havana, Cuba, for mails destined to the United States), covering regular mails originating in signatory countries.”
*279 AMENDMENTS TO THE POSTAL LAWS AND REGULATIONS
CHANGE IN RATES ALLOWED STEAMSHIP COMPANIES EOR THE CONVEYANCE OF MAILS TO FOREIGN COUNTRIES
INSERT NO. 525.
ORDER NO. 32394J DATED, AUGUST 8, 1946.
Effective August 15,1946, the Postal Laws and Regulations of 1940 are amended so as to omit paragraphs 4 and 5 of Section 2240 and by changing paragraphs 2 and 3 of this Section to read as follows: .
. “2. Unless otherwise specially _ provided, payment shall be made for the transportation of United States mails and foreign closed transit mails on steamships of both United States registry and foreign registry, and for the transportation to the United States of mails which the United States is obligated to. convey, at the rates of 8.8 cents a pound for mails consisting of letters and postcards and 1.1 cents a pound for mails consisting of other articles, including parcel post, for distances up to and including 300 nautical miles; 23.7 cents a pound for mails consisting of letters and postcards and 2.9 cents a pound for mails consisting of other articles, including parcel post, for distances from 300 up to and including 1,500 nautical miles, and 35.5 cents a pound for mails consisting of letters and postcards and 4.7 cents a pound for mails consisting of other articles, including parcel post, for distances exceeding 1,500 nautical miles.
“3. As an exception to the rates specified in paragraph 2 of this section, payment for mails which the United States is obligated to convey shall be made at the rates specified in the schedule stated below in the following services:
if: # He
“(b) From any port in the countries signatory to the conventions of the Postal Union of the Americas and Spain (except continental United States, Canada and Spain, and Havana, Cuba, for mails forwarded from continental United States for transshipment) to any other port (except ports in continental United States, Canada, and Spain, and Havana, Cuba, for mails destined to the United States); also from ports in countries not signatory to the conventions of the Postal Union of the Americas and Spain, to any other port (except ports in continental United States, Canada, and Spain, and *280 Havana, Cuba, for mails destined to the United States), covering regular mails originating in signatory countries.

AMENDMENTS TO THE CODE OF FEDERAL REGULATIONS, TITLE 39 :
Compensation for Transportation of Foreign Mails
In § 120.7 Compensation for transportation of foreign mails amend paragraphs (b) and (c) to read as follows:
(b) Def/mte rates: Unless otherwise specially provided, payment shall be made for the transportation of United States mails and foreign closed transit mails on steamships of United States registry and foreign registry at the rates specified in the schedule indicated below:
United States mails, including parcel post, on steamships of United States registry (cents per pound — net
All mails, including parcel post, on steamships of foreign registry; cmd foreign closed transit mails including parcel post, on steamships of United States registry (cents per pound— net weights)

Distance conveyed (nautical miles) weights)

Up to 300 miles_ 3.1 1.8
Over 300 up to 600 miles_ 3.1 2.5
Over 600 up to 1,000 miles- 3.1 3.1
Over 1,000 up to 1,500 miles_ 3. 6 3.6
Over 1,500 up to 2,000 miles_ 4. 7 4.0
Over 2,000 up to 2,500 miles_ 4. 7 4.4
Over 2,500 up to 3,000 miles_ 4. 7 4.7
Over 3,000 up to 3,500 miles_ 5. 0 5.0
Over 3,500 up to 4,000 miles_ 5. 3 5.3
Over 4,000 up to 5,000 miles_ 5. 6 5.6
Over 5,000 up to 6,000 miles_ 6.1 6.1
Over 6,000 up to 7,000 miles_ 6.5 6.5
Over 7,000 up to 8,000 miles_ 6. 8 6.8
Over 8,000 miles_ 7.1 7.1
(c) Exceptions to above rates. — As an exception to the rates specified in paragraph (b) of this section, payment for the mails which the United States is *281 obliged to convey shall be made at the rates specified in the schedule indicated below in the following services:
$ ‡ ‡
2. _ From any port in countries signatory to the conventions of the Postal Union of the Americas and Spain (except continental United States and Canada) to any other port; also from ports in countries not signatory to the conventions of the Postal Union of the Americas and Spain to any other port covering regular mails originating in signatory countries:

Distance conveyed (nautical miles)

All mails, Including parcel post where conveyamce is, obligated (cents per weights)
Up to 300 miles_1.3
Over 300 up to 600 miles_2.0
Over 600 up to 1,000 miles_2. 6
Over 1,000 up to 1,500 miles_3.1
Over 1,500 up to 2,000 miles_3. 5
Over 2,000 up to 2,500 miles_3.9
Over 2,500 up to 3,000 miles_4.2
Over 3,000 up to 3,500 miles_4. 5
Over 3,500 up to 4,000 miles_4.8
Over 4,000 up to 5,000 miles_5.1
Over 5,000 up to 6,000 miles_5.6
Over 6,000 up to 7,000 miles_6. 0
Over 7,000 up to 8,000 miles_6.3
Over 8,000 miles_6.6
The foregoing amendment shall be effective August 1, 1954. (R.S. 161, 396, 398, as amended, 4009, as amended, secs. 304, 309, 42 Stat. 24, 25; 5 U.S.C. 22, 369, 372, 39 U.S.C. 654.)
—PMG Order 55673, June 30, 1954 [This is insert 770 to the Postal Latos and Regulations of 191¡,8, and amends sec. 120.7 pars, (b) and (c) ]
13. From about January 1939, the plaintiff’s ships operated between ports of the United States and the countries on the east coast of South America. There was some interruption to this service during World War II, but it was resumed in 1946, and has continued. On outbound voyages from the United States, plaintiff carried mails tendered to it by the United States Post Office. On the outbound voyages from the ports of South America, it carried mails tendered to it by the Postal Administrations of Brazil, Uruguay and Argentina. This included mails from Paraguay, interport mails and mails destined for the United States and for transit through the United States.
*282 14. On January 3, 1945, the plaintiff instituted action in this court by filing case No. 46280. By that petition it claimed monies it regarded as due it for the carriage of mail outbound from ports of the east coast of South America on voyages of its vessels between those ports and ports of the United States. As a practical matter the facts as found by the court in that case were stipulated by the parties with the exception of the proper translation and the legal effect in Brazil of a law decree of that country.
15. In case No. 46280, the parties stipulated by counsel at a trial session that the plaintiff asked and received packet privileges for its vessels under the packet laws and regulations of Argentina, Uruguay and Brazil; and that the plaintiff’s vessels received certain benefits under said laws and were obligated to perform certain bui’dens under said laws.
16. The entire claim as to the northbound mail from Argentina and part of the northbound mail from Uruguay was abandoned by the plaintiff in case No. 46280 pursuant to the following stipulation between counsel for the pai'ties at a trial session:
6._ It is agreed that acting under its laws, particularly Articles 44 and 45 of the Laws of October 19,1923, under which vessels having packet privileges were obligated to carry mail gratuitously, Argentina specifically required the applicant to carry its mail gratuitously under said laws. That, accordingly, no payment is due from the United States for carriage of mails tendered by the Argentine post office.
7. It is agreed that under the laws of Uruguay, particularly the Executive Resolution of July 7,1933, all ships having packet privileges are obligated to carry the mail gratuitously; and further that said law was suspended for the war period from July 1, 1940, until November 7,1946, by the Uruguayan Government; and accordingly that no payment is due from the United States for carriage of mails tendered by the Uruguayan post office up to July 1,1940, but that payment is due from the United States on appropriate documentary proof of carriage in form acceptable to the United States Post Office for the period during which the Urugxxayan postal packet law was suspended, i.e., from July 1,1940, to the date of suit.
17. The parties in case No. 46280 similarly agreed that payment from the United States was due the plaintiff for the *283 carriage by the plaintiff of mail northbound from Brazil until June 3,1941.
18. The plaintiff’s claims in the earlier case related to mail carried no later than 1942. The claim for the carriage of all mail involved in the instant case relates to that carried by the plaintiff after World War II.
19. After 194&, the plaintiff submitted claims for the carriage of mails for which it here sues. They were, on April 17,1953, returned unpaid by covering letter of that date from the Assistant Postmaster General which reads as follows:
Reference is made to claims submitted by your company for the conveyance of north-bound mail by your vessels from Brazil, Argentina and Uruguay since 1946.
In view of the decision of the United States Court of Claims on April 3,1951 (Case No. 46280) involving the same type of mails conveyed by your vessels prior to 1942 and in view of the fact that the Supreme Court denied your petition for certiorari on November 13,1951, it appears that no compensation is payable by this Department for the conveyance of mails from Brazil and Uruguay or for mails conveyed from Argentina by vessels of your company which were granted special packet privileges by the Argentine government.
Under the circumstances the claims as submitted cannot be certified for payment by this office and are returned herewith.
20. As of March 1, 1956, the “free transit” provisions of the Postal Convention of the Americas and Spain were no longer binding upon the United States because of a reservation this country took in the 1955 convention at Bogota, Colombia.
21. The Annual Report of the United States Postmaster General for the Fiscal Year Ending June 30, 1955, provides in part as follows:
INTERNATIONAL TRANSPORTATION
The Department will propose to the Postal Union of the Americas and Spain Congress in Bogota, Colombia, October 1955, that the free transit provision of the Convention be made optional to the member countries.
This provision now requires that each country furnish its postal transportation facilities and maritime shipping services free of charge to other member countries. As a consequence, the United States is required to pay its *284 own steamship companies for the service they perform for the other member countries. And as the United States has by far the greater number of ships, this results in disproportionate use of our facilities and the expenditure of approximately $1,200,000 annually. The Department plans to terminate this arrangement in fiscal 1956.
22. The Annual Eeport of the United States Postmaster General for the Fiscal Year Ending June 30, 1956, reads in part as follows:
INTERNATIONAL SERVICE IMPROVEMENTS
Several proposals made by our representatives to the Congress of the Postal Union of the Americas and Spain, held in Bogota, Colombia, in October 1955, were adopted. These included:
1. Bulk billing of parcel post, instead of listing each parcel individually.
2. Optional increase of weight limits from 22 to 33 pounds on single packages of printed matter.
3. Elimination of the PUAS international reply coupon, in favor of the standard Universal Postal Union coupon.
Our proposal to make the free transit provisions of the Convention optional was disapproved. Therefore, the United States formulated a reservation which will reduce United States transportation costs by about $1.2 million annually. The reservation relieves the United States of responsibility for paying our steamships for transporting the mail of other PUAS countries and requires member countries to p,ay the Department for transporting their transit mail across United States territory.
23. On January 27, 1956, Albert F. Chrystal, Vice President of the plaintiff, wrote the Assistant Postmaster General in part as follows:
RE: REQUEST EOR DESIGNATION AS A “THIRD SERVICE”
Moore-McCormack Lines, Inc. hereby makes application for its designation as a “Third Service” within the meaning of the Convention of the Universal Postal Union.
This request is considered to be necessary due to the termination on March 1, 1956, of the participation by the United States in the “free transit” provision of the *285 Convention of the Postal Union of the Americas and Spain.
Pursuant to such “free transit” provisions our Moore-McCormack vessels have performed certain services for South American postal administrations gratis for almost twenty years and such foreign postal administrations have become accustomed to the receipt of such services gratis and have not been accustomed to dealing directly with us. On the other hand, they have been long accustomed to having regarded us as an instrumentality of our government and the formal designation of us as a “Third Service” seemingly would be both consistent and appropriate.
The experience of this company confirms our belief that the only way it can effect collection for its services is through being considered a “Third Service” by the United States Post Office Department. Our representatives in Uruguay have teen advised that the local posted administration under local laws will not pay us for any posted transportation. In Argentina no payment for posted transportation com, te expected tecause of a local postal pachet privilege lem and, in addition, we were never paid for parcel post accounts although such were not disputed to he due us. Brazil, however, pays us for parcel post carriages hut the rate is quite low. It is not Tenown what the attitude of the Posted Administration of Brazil will he as to payment for the carriage of Ü.P.Ú. Convention mails. [Emphasis added].
$ ‡ $
24. On March 5, 1956, the letter quoted above was answered by the Assistant Postmaster General in part as follows:
I have given careful consideration to your request of January 27,1956, that the vessels of Moore-McCormack Lines, Inc. be declared as “Third Services” by the Post Office Department.
‡ ‡ ‡ ‡ ‡
From conversations with representatives of the other steamship companies serving other member countries of the Postal Union of the Americas and Spain, we understand that they are going ahead with arrangements to make every effort to collect from the dispatching countries for the transportation of their mails. On the other hand it appears that your company has assumed that the Latin American countries you serve will not compensate you under the changed procedure and hence have asked to be declared a “third service”. Perhaps, based on your *286 experience, this assumption is correct but it seems to me that now is the time ror your company to make a real effort to collect from these countries for the services rendered.
If after a reasonable time it is apparent that you will not be successful, the Department is willing to give you such assistance as it may be able to render in liquidating the obligations owing you by the dispatching countries.
25. On September 24, 1958, the plaintiff again wrote to the Assistant Postmaster General in pertinent part:
You will recall that at the time the United States took a reservation to the provision concerning “free and gratuitous transit” of the Convention of the Postal Union of the Americas and Spain, Moore-McCormack Lines expressed its deep concern that it might encounter difficulty acting alone in collecting for the transportation of the mails of Brazil, Argentina and Uruguay.
$ $ $ $ $
The Department of State, at the request of this company has made a test case of the mail transportation services performed for Brazil by flag vessels of the U.S. registry. It can advise you of the status of its efforts. In addition to seeking the aid of the Department of State representatives of the company both before March 1, 1956, and since have frequently called upon high postal officials of Argentina, Brazil and Uruguay and have advised these officials that in the absence of adherence by the United States to the “free and gratuitous transit” provision of the Postal Union of the Americas and Spain that the company must and would expect payment by their respective administrations for the service performed for them. Statements of services performed and amounts due, based on rates currently in use, have been presented to each administration. Only one postal administration, Argentina, has categorically refused to pay for the services performed and documents attesting to this fact are enclosed. This company has pressed ana continues to press the postal administrations of Uruguay and Brazil for answers. Based upon experience and the advice of local management and local counsel, this company is convinced it is hopeless to pursue this course.
The spirit of the final paragraph of your letter quoted above [see Finding 24] is greatly appreciated. For over two and a half years this company had made a real effort to collect and has failed; we believe that you will agree that after a reasonable time it has become apparent that *287 we will not be successful in our present course.. Therefore your assistance is most urgently required and requested.
$ $ * $ $
26. The reply to the above-quoted letter was sent on November 6,1958, and reads as follows:
A reply to your letter of September 24 has been held in abeyance pending study and an opinion by our General Counsel.
It has been pointed out that the local laws of Argentina, Brazil, and Uruguay require gratuitous transportation of mail in return for your company enjoying postal packet privileges. Hence, in a sense you have a contract with those countries which does not brook interference by this Department.
There is a possibility that if we declared Moore-McCormack a third service the three countries involved would take some action against you, either in the form of revoking the postal packet privileges or even something more drastic. That, in turn, could lead to complications.
Another complication is that to designate Moore-McCormack now a third service would be in conflict with the Post Office Department’s position in cases pending in the Court of Claims.
You mention that the Department assists American flag air carriers to obtain payment from foreign countries and consequently feel that this justifies domg likewise with steamship lines.
However, there is a difference. None of the South American countries involved requires air carriers to transport air mail free of charge, either as a condition of entry or in return for special privileges as they do in the instance of steamship lines. Thus, those countries appear to be under legal obligation to make payment to the air carriers and any assistance we render is to collect a just debt and not to enable the airlines to evade a legal obligation they owe to such foreign countries.
My letter of March 5, 1956 stated that the Department is willing to give you such assistance as it may be able to render. However, when viewed in the light of the circumstances set forth above, I believe you will agree there is nothing more we can do.
Believe me, I am extremely sorry to find it necessary to answer you in this vein.
*288 27. There is in evidence as defendant’s exhibit 11 a pamphlet in the Spanish language entitled “digesto marí-timo y eluvial”. According to the witness, Mr. Bosch, counsel for the Consulate General of Argentina in New York, by whom it was identified, it was an official document issued by the Maritime National Perfecture, an agency of the executive department of the Argentine Government.
Article 421 of the “Digesto Marítimo Y Fluvial”, as translated into English, reads in part as follows:
All foreign ships with postal packet privilege shall be subject to the following obligations: (A) to carry gratuitously the mail and postal matter delivered to them by the general post office and telegraph for their ports in their itinerary or for the ports which they shall come to in transit.
28. Postal packet privileges were in fact granted to several of the plaintiff’s vessels which were effective during the period for which claim is made herein.
29. In early 1957, pursuant to formal request made by the plaintiff, the General Director of the Ministry of Communications of Argentina issued the following certificate to which the seal of the Ministry was affixed, the translation from Spanish of which reads as follows:
ARGENTINE REPUBLIC
MINISTRY OE COMMUNICATIONS.
SEAL OP THE MINISTRY OE COMMUNICATIONS, GENERAL ADMINISTRATION.
FileN0 799/MC/57.
The Ministry of Communications of the Nation hereby certifies that all the vessels of “Moore-McCormack Lines, Inc.” which transported the mail gratuitously out of our country from 1948 through the period ending February 29th, 1956 did so in full compliance with the obligations arising from the Conventions of the Postal Union of the Americas and Spain of Bio de Janeiro (1946) and Madrid (1950), without the necessity of applying the regulations concerning Postal Packet Privileges.
It is hereby stated that the Attorney General (Pro-curación del Tesoro de la Nación) has isued his favorable opinion in order that the present certificate be extended in the above mentioned terms.
*289 Given, signed and sealed in the City of Buenos Aires, Federal Capital of the Argentine Eepublic, on the 21st day of the month of February of the year 1957.
30. On November 7, 1946 an executive decree, No. 8011, was issued by the President of the Eepublic of Uruguay which promulgated regulations for the concession of Packet Privileges. No translation from the Spanish is in evidence, though the text in Spanish is a part of defendant’s exhibit 3, in evidence.
31. On January 3, 1952, the President of the Eepublic of Uruguay issued decree No. 20730, the translation from the Spanish of which reads in part as follows:
REGULATIONS EOR THE CONCESSION OE A PATENT OE PACKET PRIVILEGES.-
Decree N° 20730. 3rd. January 1952.
Ministry of National' Defense — Ministry of Foreign Affairs — Ministry of Finance — Ministry of Industry and Labour — Ministry of Public Health.—
Montevideo, 3rd January 19511.
Pursuant to the antecedents, by which the Commission appointed by Decree N° 19194 of 28th August 1951, to revise the Eegulations for Packet Privileges approved by Decree N° 8011 of 7th November 1946, submits for the consideration of the higher authorities a draft of proposed Eegulations to substitute those at present in force:
Whereas the draft of Eegulations for the concession of a Patent of Packet Privileges, now submitted for consideration, has been composed by a Commission comprising representatives of all the organizations interested in its application, taking as a base for same the general framework of the previous Eegulations, having rectified the deficiencies and inconveniences which its subsequent application made evident, and endeavoring at the same time to compile a more rational and precise text:

The President of the Republic Decrees:

Art. 1°.-That the Eegulations for the Concession of Patents of Packet Privileges be approved as worded in administrative documents Series * * *, in substitution of the actual Eegulations for Packet Privileges approved by Decree N° 8011 of 7th November 1946.-
*290 REGULATIONS FOR THE CONCESSIONS OF A PATENT OF PACKET PRIVILEGES
Art. 1. — Packet Privileges signify tbe special advantages or prerogatives conceded to national and foreign vessels in accordance with the categories specified in these Regulations. These Privileges shall be conceded by Government Authority, which reserves the right to reject or cancel same if necessary even in circumstances where all the required conditions have been complied with regarding the vessels for which same were solicited-
*****
OBLIGATIONS OF VESSELS HOLDING PACKET PRIVILEGES.
National or Foreign Vessels of Category £A’
Art. 11. — All National or Foreign vessels holding Packet Privileges of Category £A’, or whose Petition for same is under consideration, or as the case may be, their Agents, are subject to the following obligations:
a) To carry free of charge all Mails and Parcel Post packages delivered to them by the General Postal Authorities for the ports of their itinerary or ports of call in transit.- It is understood that this obligation applies exclusively to Mails and Parcel Post from or for ports of the Republic.
$ $ ‡ ‡ $

National or Foreign Vessels of Category iB‘>

Art. 12. — National or Foreign vessels holding Patents of Packet Privileges of Category £B’, or whose Patents are in process of being isued, or as the case may be, their Agents, are required to comply with the provisions stipulated in clauses a), b), c), d), e), f), h), i), j), and k), of Article 11 of these Regulations.

National or Foreign Vessels of Category lC:

Art. 13. — National or Foreign Vessels holding Patents of Packet Privileges of Category £C’, or whose Patents are in process of being issued, or as the case may be, their Agents, are subject to the following obligations:
a) To carry free of charge, whenever necessary, Mails and Parcels Post packages as established for National or Foreign vessels of Category £B\- The General Postal Authorities will utilize the services of these ships for the *291 carriage of Mails and Parcels Post packages when vessels, holding Packet Privileges of the other Categories plying these routes, are not .available-
$ $ $ $ $
32. The plaintiffs did request and receive packet privileges for several of its ships.
33. On December 4, 1958, a certificate was issued at the request of the plaintiff and with the consent of the Ministry of Industry and Labor of Uruguay by the General Secretary thereof. A translation from the Spanish is as follows:
bn 2097979
TRADUCCION N° 10.511/58.
GENERAL POST OFFICE DIRECTION. File N. 103/57-12/4/58. SGS. I CERTIFY: That the free carriage of mail on the steamers of Moore-McCormack Lines, Inc., of the United States of America over the period 1948-1956 was made in compliance with the Convention of the Postal Union of the Americas and Spain (Union Postal de las Americas y España). And, upon the request of the interested concern, and with the corresponding consent of the Ministry of Industry and Labor (File Nr. 103/57) dated 12/4/58, this Certificate is issued in Montevideo the twentyseventh day of June of the year Nineteenhundred and fifty eight. Sgd. ZULEMA JARDON. General Secretary. Visaed. Sgd. Colonel RUBEN M. MACCHI. Post-Office Comptroller.
Seal of the General Post-Office Direction. The document is issued on a Post-Office sheet of paper Nr. B1— 138675.
THE ABOVE IS-TO THE BEST OE MV KNOWLEDGE AND BELIEE A TRUE TRANSLATION OE THE SEANISH CERTIFICATE AND A COPT HEREOE IS KEPT ON EILE UNDER NR. 10.51l/58. ISSUED IN MONTEVIDEO THIS TWENTIETH DAT OE JULY NINETEENHUNDRED AND EEPTTEIGHT, UNDER MV HAND AND SEAL.
(S) SUSANA BERRO GALLEGOS
PUBLIC TRANSLATOR.
34. In 1946 the plaintiff’s vessels resumed the service to Brazil which had been interrupted by World War II. These ships carried mail southward from the United States to Brazil, and on the northbound voyages carried mail tendered by the Postal Authorities of Brazil.
*292 35. On September 18, 1946, Brazil adopted and promulgated a new constitution. Article 141, as translated from the Portuguese, provides in part as follows:
$ $ $ $ *
Paragraph 16. The right of property is guaranteed, except in the case of expropriation for public necessity or utility, or in the social interest, preceded by just compensation in cash. In the event of imminent danger, such as war or internal commotion, the proper authorities may use private property, if this shall be required for the public good, the right to subsequent compensation being, however, assured.
# iH H: * *
36. In October 1913, Decree No. 10,524 was issued which regulated the issuance of packet privileges and imposed certain obligations upon those ships to which packet privileges were issued. This decree provided in part, as translated from the Portuguese, as follows:
Art. 159. — In order to have the right to these privileges, the enterprises, companies or owners of the ships must prove that the same are registered, in accordance with this regulation and that they have been surveyed at the proper time, also meeting or undertaking to meet all specially stipulated conditions demanded by the Ministry of Transport and Public Works, under terms or contracts made with the said Ministry, besides accepting the following obligations:
* * * * *
b) — to transport free of charge on their ships the mail bags, bringing them from shore to ship, or “vice-versa”, or to deliver them to the Agents of that Department duly authorized to receive them, the delivery or reception being made against receipt:
Hi ❖ Hi # #
Further this decree granted concessions to ships issued packet privileges in the following terms, as translated:
Hi Hi * Hi *
CHAPTER XIX
Concession of packet boat privileges and of any other special favors or subventions and fiscalization of same.
Art. 157. — Passenger ships or only cargo vessels plying on regular shipping lines between ports of more than one State, will enjoy, as packet-boats, the fohowing priv *293 ileges, granted by the Ministry of Transport and Public Works :-
lst.-The faculty of sailing at any hour of the day or night, once the rulings of this regulations are complied with;
2nd.-The faculty of being allowed to disch~arge immediately, independent of Customs' permission and the presence of the respective guards;
3rd.-The exemption from Light-house taxes;
4th.-The exemption from contributing to houses of charity at all ports of the Republic;
Sth.-Using a passport while awaiting change of the certificate of register, and if there is space for annotations;
6th.-Free passes or sailing dispatches for packets only subject to maximum Federal stamps of 1$000, [sicj and which will continue to be given by Customs, Police, Post-Office and Captain of the Port;
1Tth.-Concession of a 50% rebate on the docking charges, mooring to quay side, loading or discharging, to which foreign ships are subject to, duly respecting contracts in force on the date that this regulation is promulgated;
8th.-Dispenses from paying in ports, double expenses of loading, discharging and stevedoring of goods, on approved by the Government, the vessels are obliged Sundays and Holidays, when by reason of a schedule to call at or remain in ports on those days, contracts in force on the date of promulgation of this regulation being duly respected.
* * * *
37. On June 3, 1941, at a time when the Executive in Brazil had taken over the legislative function of the Congress, decree law No. 3.326 was issued by President Vargas. The English translation of this decree law provides in part as follows:
ARTICLE 1. Transportation of articles of correspondence and of postal despa.tches shall be made:
* * * *
II. On fiuvial, maritime and lacustrine routes:
(a) In Brazilian vessels of any description;
(b) In steamships or packets belonging to foreion carriers, whether subsidized or not sailing regulai~ly between ports of Brazil and those o~ foreign countries.
*294 ARTICLE 2. It shall be obligatory for all fluvial, lacustrine and maritime carriers or companies of navigation and for Federal, State or Municipal railroads, to transport postal despatches and articles of correspondence gratuitously, without limitation on weight or volume.
SECTION 1. The transportation shall also be obligatory and gratuitous on railroads, navigation or public highway companies or carriers enjoying especial treatment, benefits or favors from the Union, the States and Municipalities.
SECTION 2. In case of vessels the net tonnage of which is equal to, or less than ten tons, the weight of despatches to be transported shall not exceed 4% of such capacity.
38. On April 14, 1943, at a time when the powers of the Congress were being exercised by the Executive, President Vargas issued decree law No. 5406, which modified light dues (sometimes called lighthouse dues), and the granting of packet privileges. A translation of this decree reads in part as follows:
The President of the Republic, exercising the powers vested in him under Article 180 of the Constitution, decrees:—
Art. 1. Foreign vessels calling at Brazilian ports, proceeding from foreign or Brazilian ports, with cargo or in ballast, carrying passengers or not, whether cleared for the port or putting in in distress, are obliged to pay light dues amounting to two thousand cruzeiros (Cr$ 2,000.00).
Sole Paragraph. This tax shall be payable as many times as such vessels enter any Brazilian port, not only on an outward but also on a return voyage.
Art. 2. Mail boats, universally recognized as such, i.e., those which carry passengers, mails and cargo, and steamers of regular lines, which enjoy the privileges of the former shall only pay the tax referred to, in the first two ports of call, both on the outward and return voyages. A certificate of this payment must be applied for, and will serve as proof in the other ports.
Hi $ H? H»* ❖
Art. 5. Steamers on regular lines, in order to enjoy packet privileges must be recognized as such by the Directorate General of the National Exchequer, on an application reported on by the Directorate of Customs Revenue and accompanied by:—
*295 a) a certificate from the respective Custom House, testifying that the line is a regular one;
b) an authentic document giving the cargo capacity of the vessel, for which purpose the certificate of registry, passport, or Lloyd’s register certificate may be presented.
Paragraph 1. The application having been reported on, it shall be submitted to the Director General, who, after examining the dossier, shall order the certificate (carta declaratoria) to be issued, on which stamps shall be paid at the Eeceiving Office of the Federal District or at the Custom Houses in the States, to twice the amount of No. 31 of the table accompanying Decree-Law No. 4,655 of 3rd September 1942.
Paragraph 2. The grant of packet privileges entails the fulfillment of the obligations laid down in Chapter YTY of Decree No. 10,524 of 23rd October 1913, Decree No. 16,300 of 31st December 1923, and Art. 54 of Law No. 4,984 of 31st December 1925.
* * * * *
39. In June 1951 an Executive decree of January 17,1951 was issued. Chapter VI of this decree contains essentially a rewrite of the 1941 decree law quoted in finding 37.
40. The Annual Eeport of the United States Postmaster General for the Fiscal Year Ending June 30, 1955, provides in part as follows:
INTERNATIONAL TRANSPORTATION
The Department will propose to the Postal Union of the Americas and Spain Congress in Bogota, Colombia, October 1955, that the free transit provision of the Convention be made optional to the member countries.
This provision now requires that each country furnish its postal transportation facilities and maritime shipping services free of charge to other member countries. As a consequence, the United States is required to pay its own steamship companies for the service they perform for the other member countries. And as the United States has by far the greater number of ships, this results in disproportionate use of our facilities and the expenditure of approximately $1,200,000 annually. The Department plans to terminate this arrangement in fiscal 1956.
41. Prior to August 1,1954, the Post Office Department required steamship companies to transport all incoming mails from the ship to the post office. The plaintiff, during the *296 times material herein, December 1951 through August 1, 1954, did so transport mail from ship to post office. The cost to the plaintiff for this trucking service was $8,858.61.
42. Section 405. (a) of the Merchant Marine Act of 1986 (74 Stat. 1985,1995) provides as follows:
% * * Hi *
All mails of the United States carried on vessels between ports between which it is lawful under the navigation laws for a vessel not documented under the laws of the United States to carry merchandise shall, insofar as practicable, be carried on vessels of United States registry.
$ # * * #
43. The Annual Eeport of the United States Postmaster General for the Fiscal Year Ending June 30,1923, provides in part as follows:
FOREIGN MAIL SERVICE
The Foreign Mail Service covers all the relations between the United States and foreign countries in the exchange of mails between them.
Every opportunity for the safe and expeditious dispatch of mails to foreign countries is employed. In the assigning of mails for dispatch abroad vessels of American registry are employed in preference to vessels of foreign registry. This preference is limited to 24 hours for American vessels over a competing foreign vessel in the anticipated time of arrival in the port of destination. When the American vessel has sea-post service the preference is extended to 48 hours, because the distribution of mails on board tends to equalize the difference in time of arrival.
44. The Post Office Department accorded a preference to United States flag vessels as expressed in the Postmaster General’s report from at least 1923. The 24-hour preference was. extended to 48 hours at some point between 1923 and 1953.
45. Beginning about February 1953, and ending at the end of February 1956, the Post Office Department withdrew this preference to United States flag vessels over vessels flying the flags of countries signatory to the Convention of the Postal Union of the Americas and Spain, and sent a substantial quantity of mail by foreign ships which the plaintiff’s were ready, able and willing to carry.
*297 46. On February 21, 1956, tbe Director, International Service, United States Post Office, Bureau of Transportation, wrote to tlie Postmasters at New York and New Orleans, in part, as follows:
Effective March 1, 1956, the “free transit” provisions of the Convention of the Postal Union of the Americas and Spain will no longer be operative insofar as the United States is concerned. Hence certain changes are necessary in the submission of the above-named reports on and after that date.
* $ ‡ $
Unless you are advised to the contrary prior to March 1, 1956, on and after that date ships of United States registry serving ports in countries that are members of the Postal Union of the Americas and Spain will be accorded the same preference as other United States flag ships; i.e., 2 days for letters and preferential prints and 7 days for non-preferential prints and parcel post. (This supersedes our letters of March 30, 1953 and December 22,1954).
47. The Post Office Department made no payment to anyone for the carriage of mails, which plaintiff claims its vessels were entitled to carry, where such mails were transported by Postal Union of the Americas and Spain vessels.
CONCLUSION OK LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover and, therefore, the petition is dismissed.

 No translation of this decree is in evidence.